[Cite as *State v. Hipshire*, 2011-Ohio-3863.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## DARKE COUNTY

STATE OF OHIO                          :
                                       :       Appellate Case No. 2010-CA-07
    Plaintiff-Appellee          :
                                       :       Trial Court Case No. 09-CR-71
v.                                     :
                                       :
MICHAEL L. HIPSHIRE                     :       (Criminal Appeal from
                                       :        Common Pleas Court)
    Defendant-Appellant         :
                                       :
      . . . . . . . . . . .

# O P I N I O N

Rendered on the 5th day of August, 2011.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty. Reg. #0020615, Darke County Prosecutor's Office, Courthouse, Third Floor, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

MICHAEL R. PENTECOST, Atty. Reg. #0036803, 117 South Main Street, Suite 400, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Michael Hipshire appeals from his conviction and sentence for Involuntary Manslaughter and Knowingly Failing to Provide for a Functionally Impaired Person. These charges resulted from the death of Hipshire's wife, Mary Anne, in February 2009.

{¶ 2}    Hipshire contends that the trial court erred in failing to instruct the jury on the lesser-included offense of Reckless Homicide.    Hipshire further contends that the trial court erred in failing to merge the offenses of Involuntary Manslaughter and Knowingly Failing to Provide for a Functionally Impaired Person.

{¶ 3}    We conclude that the trial court erred in refusing to instruct the jury on Reckless Homicide.    Reckless Homicide is a lesser-included offense of Involuntary Manslaughter.    Moreover, construing the evidence in a light most favorable to Hipshire, a jury could reasonably conclude that Hipshire was not guilty of Involuntary Manslaughter, but was guilty of Reckless Homicide.    Because this conclusion requires the reversal of Hipshire's conviction for Involuntary Manslaughter, the assignment of error pertaining to the merger of offenses is moot.

{¶ 4}    Accordingly, that part of the judgment of the trial court convicting Hipshire of, and sentencing him for, Involuntary Manslaughter is Reversed, his conviction and sentence for Knowingly Failing to Provide for a Functionally Impaired Person is Affirmed, and this cause is Remanded for further proceedings.

I

{¶ 5}    At 4:44 a.m. on Wednesday, February 18, 2009, the dispatcher for the Darke County Sheriff's Office received a call from Michael Hipshire.    Hipshire said that his wife, Mary Anne, was dead.    Hipshire said he had been taking care of his wife since her accident and that it had been about two days since he had seen her.    Hipshire also stated that the dogs had started eating his wife's body.    The police and rescue squad were immediately dispatched to the Hipshire residence.

**{¶ 6}** When the officers arrived, the condition of the house was deplorable. Dog feces were all over the floor, and the smell of urine, feces, and dogs was everywhere. There were 10 to 20 dogs inside the house. Although the electricity was on, the house had no running water for the past two weeks. Mary Anne Hipshire was found dead in an upstairs bedroom. Animals had eaten a significant part of her left arm and chest area.

**{¶ 7}** Michael Hipshire told the officers that his wife had been in declining health for a year or two, and had been getting increasingly worse after she was involved in a traffic crash in January 2009. Hipshire said that his wife stayed upstairs and he stayed downstairs. He also told police that he had a hard time going up and down the stairs, but did check on his wife.

**{¶ 8}** The last time Hipshire had checked on Mary Anne was the day before he discovered her death. On Tuesday, around 12:30 p.m., Hipshire called upstairs to ask his wife if she needed anything, and she said no. Hipshire had previously gone upstairs on Monday, around 12:30 p.m., to turn on the television for his wife. At that time, she drank some pop and ate parts of a Dreamsicle and a Fudgesicle. She also ate part of a Dreamsicle and drank some cream soda on Sunday afternoon, around 3:15 p.m.

**{¶ 9}** Hipshire believed the last time his wife had been out of bed was on the previous Saturday, when he heard her stumbling around and yelling at the dogs. Beginning on Saturday, Mary Anne no longer wanted to use the commode, because she just could not support her weight. At that time, Hipshire began to put pads under her. He had changed the pads twice since Saturday.

**{¶ 10}** The coroner indicated that the immediate cause of death was dehydration with

associated renal failure. Mary Anne's death was contributed to by complications of a urinary tract infection that developed into sepsis, which is an infection that is spread throughout the body. The time of death was estimated as somewhere between February 17, 2009, and the early morning hours of February 18, 2009. The death was ruled a homicide, based on lack of care. According to the State's witness, a coroner, it would not have been reasonable for a caretaker to only check on Mary Anne once a day in the condition she would have been in during the last days of her life. If medical help had been summoned over the last week of Mary Anne's life, her death could have been avoided.

**{¶ 11}** The record indicates that Michael Hipshire had graduated from nursing school at Sinclair Community College in 1987, and had been employed as a nurse at various places until 2008. These places included Richmond State Hospital, Miami Valley Hospital, Middletown Hospital, Miami County Hospice, and two nursing homes. Hipshire had worked at Hospice for about ten years, between 1995 and 2005.

**{¶ 12}** Hipshire indicated that his wife had last worked in 2004 or 2005. She was on disability and could not sit for any length of time. She had spent two months at a nursing home in 2008, after breaking her kneecap and both bones in her lower leg. She also had arthritis and osteoporosis. Most of the time for the past year, Mary Anne had been in and out of bed. Since the car wreck on January 21, 2009, her condition had gone downhill completely, she did not want to eat, and she had given up on life. Mary Anne kept telling her husband that she wanted to die. The only income they had was from Mary Anne's Social Security check.

**{¶ 13}** According to Hipshire, he and his wife had a system with a bell. Whenever

the bell rang, he would get what she wanted. Sometimes she just wanted to be repositioned. Hipshire talked to Mary Anne on Sunday about how she had to get better because she was going downhill. He had urged her to go to the hospital, but she would not go.

{¶ 14} Although the downstairs of the house did not appear to be heated, Mary Anne's bedroom had an electric heater, and was warmer than where Hipshire slept. There was a box of Frosted Flakes and some Corn Flakes on the night-stand by her bed. The refrigerator downstairs also had food in it, including popsicles and Dreamsicles. Mary Anne additionally was receiving some medication – her bloodstream contained low levels of Darvon, a pain-killer, Flexeril, a muscle relaxant, and Xanax. Hipshire further indicated that when he spoke with Mary Anne on Saturday, her pupils were equal and her arm strength was fine.

{¶ 15} George Nichols, a pathologist, testified on Hipshire's behalf. Nichols concluded that the cause and manner of death were accidental. Nichols stated that in most cases, a urinary tract infection is easily recognized because it causes pain. He noted, however, that Mary Anne had previously developed a urinary tract infection while in a nursing home in 2008, and did not complain of the usual things associated with such an infection, like pain. Nichols attributed this to prior surgical procedures in the cervix area, which may have inhibited motor control and sensitivity to pain.

{¶ 16} Nichols agreed that Mary Anne's death was caused by two infections that were ongoing for days, and should have caused sepsis. He indicated, however, that in cases of overwhelming sepsis, an individual may go into shock very quickly and die within hours without medical intervention. Nichols also noted that Mary Anne had been taking immunosuppressive drugs for her rheumatoid arthritis, which may have caused her disease to

progress more quickly.

{¶ 17} Nichols further observed that Mary Anne was normally nourished, and that her skin was clean, with the exception of her right hand, which he attributed to terminal soiling. Mary Anne also had small superficial erosions on her buttocks, or early bed sores that were very shallow. These can occur within 8 to 12 hours, and indicated that Mary Anne had not been lying in bed for days. Nichols did indicate that it would have been unreasonable for Hipshire not to have called someone to check on Mary Anne if, as the evidence indicated, Hipshire had told someone a few days before Mary Anne died that she was extremely ill and that he thought she had suffered from a stroke.

{¶ 18} Finally, there was no dispute that the animal predation occurred post-mortem, and did not contribute to Mary Anne's death. Nichols stated that predation occurs even when animals are not malnourished or mistreated. There was also no dispute about the fact that Mary Anne was not malnourished at the time of her death.

{¶ 19} After the evidence was concluded, the trial court refused to charge the jury on Reckless Homicide. The court instructed the jury only regarding Involuntary Manslaughter and the underlying charge of Knowingly Failing to Provide for a Functionally Impaired Person. Hipshire was convicted of the offenses as charged, and was sentenced to four years for Involuntary Manslaughter, and one year for Knowingly Failing to Provide for a Functionally Impaired Person, with the sentences to run consecutively. Hipshire appeals from his conviction and sentence.

II

{¶ 20} Hipshire's First Assignment of Error is as follows:

{¶ 21} "THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF RECKLESS HOMICIDE."

{¶ 22} Under this assignment of error, Hipshire contends that the trial court erred in refusing to instruct the jury on the lesser-included offense of Reckless Homicide. The trial court instructed the jury on the elements of Involuntary Manslaughter, but stated that it could find nothing to indicate that Reckless Homicide was a lesser-included offense in terms of statutory interpretation or common law decision.

{¶ 23} "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, * * * be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Deem* (1988), 40 Ohio St.3d 205, 206, paragraph three of the syllabus, as modified by *State v. Evans*, 122 Ohio St.3d 381, 387, 2009-Ohio-2974, ¶26 (which omitted the word "ever" from the second element).

{¶ 24} In its brief, the State acknowledges, "for the sake of argument," that the elements in *Deem* may have been satisfied in the case before us. The State argues, however, that the trial court did not abuse its discretion by failing to give the instruction, because the evidence justified the court's decision.

{¶ 25} As a preliminary matter, we note that the court did not refuse, after hearing the evidence, to give the instruction based on the insufficiency of evidence; the court's decision was based on the lack of legal support for the proposition that Reckless Homicide is a lesser-included offense of Involuntary Manslaughter.

{¶ 26} Hipshire was convicted of having violated R.C. 2903.04(A), which provides that:

{¶ 27} "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

{¶ 28} R.C. 2903.04(A) does not specify a culpable mental state, but the mental state "is supplied by the underlying offense." *State v. Carusone*, Hamilton App. No. C-010681, 2003-Ohio-1018, ¶47.   In the case before us, the underlying felony offense for which Hipshire was indicted is a violation of R.C. 2903.16(A), which states that:

{¶ 29} "No caretaker shall knowingly fail to provide a functionally impaired person under the caretaker's care with any treatment, care, goods, or service that is necessary to maintain the health or safety of the functionally impaired person when this failure results in physical harm or serious physical harm to the functionally impaired person."

{¶ 30} In comparison, the Reckless Homicide statute provides that "No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.041(A).

{¶ 31} Reckless Homicide carries a lesser penalty, because it is a felony of the third degree, whereas an Involuntary Manslaughter occurring in the commission of a felony is a felony of the first degree.   Compare R.C. 2903.041(B) and R.C. 2903.04(C).   As statutorily charged in the case before us, Involuntary Manslaughter cannot be committed without Reckless Homicide having been committed, because Reckless Homicide only requires that an individual recklessly cause the death of another.   In contrast, R.C. 2903.04 and R.C.

2903.16(A) require that the caretaker knowingly fail to provide care, services, or treatment to a functionally impaired person that results in the death of the impaired person.

**{¶ 32}** Under R.C. 2901.22(B):

**{¶ 33}** "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

**{¶ 34}** Recklessness is defined as follows:

**{¶ 35}** "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

**{¶ 36}** The second prong of the *Deem* test is met, because a person cannot cause the death of another by knowingly failing to provide treatment, without also recklessly causing the death. See, *e.g.*, *State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, ¶190 (concluding that Reckless Homicide is a lesser-included offense of felony murder, because, among other things, "a defendant cannot cause the death of a person under R.C. 2903.01(B) without also causing the death of that person under R.C. 2903.041. In purposely causing the death of another, one has to first become reckless in causing the death of another."). See, also, *State v. Carlisle*, Montgomery App. No. 22970, 2009-Ohio-6004, ¶48-63 (concluding, in murder case, that the trial court did not err in failing to instruct on the lesser-included offense of Reckless Homicide, because the evidence at trial did not support the instruction. Counsel also did not

provide ineffective assistance of counsel by failing to also request instructions on the lesser-included offenses of Involuntary Manslaughter and Voluntary Manslaughter).

{¶ 37} In *State v. Wright*, Scioto App. No. 01CA2781, 2002-Ohio-1462, the Fourth District Court of Appeals noted that:

{¶ 38} "The state does not dispute that reckless homicide and involuntary manslaughter are lesser-included offenses of murder under Ohio law. A person commits murder when he purposefully causes the death of another. R.C. 2903.02(A). A person commits reckless homicide when he recklessly causes the death of another. R.C. 2903.041(A). A person commits involuntary manslaughter when he causes the death of another as a proximate result of committing or attempting to commit a felony or misdemeanor. R.C. 2903.04. As the state concedes, the difference between the three crimes is the offender's intent (see *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264), and thus both reckless homicide and involuntary manslaughter are lesser-included offenses of murder." Id. at ¶24 (Footnote and citations omitted).

{¶ 39} Finally, the third element in *Deem* is satisfied, because "some element of the greater offense is not required to prove the commission of the lesser offense." 40 Ohio St.3d at 206. The greater offense, Involuntary Manslaughter, requires proof that the offender was committing or attempting to commit a felony; Reckless Homicide only requires that the offender recklessly caused the death of another.

{¶ 40} Where the *Deem* test has been satisfied, "[i]f the evidence is such that a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense, then the judge should instruct the jury on the lesser

offense." *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 333, 2007-Ohio-2072, ¶11, citing *State v. Shane* (1992), 63 Ohio St.3d 630. In deciding whether to instruct the jury on a lesser-included offense, the trial court must view the evidence in a light most favorable to the defendant. *Trimble*, 2009-Ohio-2961, ¶192. "The lesser-included-offense instruction is not warranted every time 'some evidence' is presented to support the lesser offense. * * * Rather, a court must find 'sufficient evidence' to 'allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.' " Id. (Citations omitted).

{¶ 41} In addressing this argument, the State notes that we apply an abuse of discretion standard in reviewing a trial court's decision not to instruct on a lesser-included offense. This is correct. See, *e.g.*, *State v. Wolons* (1988), 44 Ohio St.3d 64, 68. However, in the case before us, that does not require the degree of deference that the State suggests. The trial court based its decision on incorrect legal grounds, not on factual conclusions relating to the state of the evidence. Therefore, the court's stated reason for refusing to give the instruction was based on unsound reasoning – an error of law – and in that respect, was an abuse of discretion. See, *e.g.*, *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp*. (1990), 50 Ohio St.3d 157, 161 (noting with regard to abuse of discretion standard that "[a] decision is unreasonable if there is no sound reasoning process that would support that decision").

{¶ 42} Furthermore, on reviewing the evidence in a light most favorable to Hipshire, we conclude that there is sufficient evidence to allow a jury reasonably to reject a finding of Involuntary Manslaughter, and to find Hipshire guilty of Reckless Homicide.

**{¶ 43}** As noted, R.C. 2903.041(A) provides that "No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

**{¶ 44}** There is no doubt that the circumstances of the case before us are extremely distasteful with regard to the animal predation and the condition of the Hipshire home. These circumstances, while deplorable, did not cause Mary Anne's death. Although Hipshire should have been more attentive to his wife's condition, there is evidence that she was not malnourished, that she did receive food and medication, and that some degree of care was given. A jury could reasonably conclude that Hipshire showed heedless indifference to the consequences and perversely disregarded a known risk that his conduct was likely to result in his wife's death, thus meriting the Reckless Homicide instruction. Accordingly, the trial court erred in refusing to instruct the jury on Reckless Homicide as a lesser-included offense.

**{¶ 45}** Hipshire's First Assignment of Error is sustained. The judgment of conviction and sentence for Involuntary Manslaughter will be reversed, the judgment of conviction and sentence for Knowingly Failing to Provide for a Functionally Impaired Person will be affirmed, and this cause will be remanded for further proceedings.

III

**{¶ 46}** Hipshire's Second Assignment of Error is as follows:

{¶ 47} "THE TRIAL COURT ERRED IN FAILING TO MERGE THE OFFENSES OF INVOLUNTARY MANSLAUGHTER AND FAILURE TO PROVIDE FOR A FUNCTIONALLY IMPAIRED PERSON."

{¶ 48} Under this assignment of error, Hipshire contends that the trial court should have merged the offenses of Involuntary Manslaughter and Knowingly Failing to Provide for a Functionally Impaired Person, because the offenses are allied offenses of similar import. This assignment of error is moot, due to the reversal of the judgment of conviction for Involuntary Manslaughter.

{¶ 49} Hipshire's Second Assignment of Error is overruled, as moot.

IV

{¶ 50} Hipshire's First Assignment of Error having been sustained, and his Second Assignment of Error having been overruled as moot, the judgment of conviction and sentence for Involuntary Manslaughter is Reversed, the judgment of conviction and sentence for Knowingly Failing to Provide for a Functionally Impaired Person is Affirmed, and this cause is Remanded for further proceedings in accordance with this opinion.

. . . . . . . . . . . . .

GRADY, P.J., and FROELICH, J., concur.


Copies mailed to:

R. Kelly Ormsby, III
Michael R. Pentecost
Hon. Jonathan P. Hein