[Cite as *State v. Turner*, 2019-Ohio-144.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-78 |
| | : | |
| v. | : | Trial Court Case No. 16-CR-578 |
| | : | |
| TEVIUS S. TURNER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 18th day of January, 2019.

. . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Clark County Prosecutor's Office, Appellate Division, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

CHRIS BECK, Atty. Reg. No. 0081844, 1370 N. Fairfield Road, Suite C, Beavercreek, Ohio 45432
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tevius[1] S. Turner was indicted on charges of aggravated murder, murder (purposeful), and felony murder, all with firearm specifications, together with charges of felonious assault, tampering with evidence, and improper handling of a firearm in a motor vehicle. After a jury trial, he was convicted and sentenced for purposeful murder with a firearm specification, tampering with evidence, and improper handling of a firearm in a motor vehicle.[2] The trial court's judgment will be reversed as to Turner's purposeful murder conviction only, and this matter will be remanded for further proceedings consistent with this opinion.

### Factual Background and Procedural History

{¶ 2} Turner was the manager of a Springfield-area hotel where Evan Stewart had worked as a cook until being fired. On November 18, 2016, Stewart arrived at the hotel before noon to pick up his final paycheck. Turner greeted Stewart, placed Stewart's paycheck and some cash on the hotel's front desk, and asked Stewart to sign over the paycheck to repay money Turner previously had loaned to Stewart. The cash was intended to compensate for the difference between the amount of the paycheck and what Stewart owed Turner on the personal loan. An argument about Stewart's termination ensued. When Turner walked away to attend to other business matters, Stewart left with both his paycheck and the cash.

{¶ 3} Stewart proceeded to a local convenience store in a Chevy Malibu driven by

---

[1] The indictment, the trial court's docket entries, the judgment entry of conviction and sentence, and the ODRC offender directory all list Turner's first name as "Tevius." However, the briefs filed in this court instead refer to Turner as "Tevious," which the trial transcript indicates is the correct spelling. (See Tr. 452-453). Here, we have used the spelling that appears in the appealed judgment.

[2] The jury also found Turner guilty of other charges, which the trial court merged at sentencing.

Melody Turner, his cousin.[3] Accompanied by hotel employee Leanna Mills, Turner thereafter drove to the same location in his black BMW. Upon arriving, Turner parked his car next to Melody's Malibu. Stewart already had entered the store and unsuccessfully attempted to cash his paycheck. Turner met him inside and again requested the check, but Stewart refused to surrender it. Stewart then left the store and got into the passenger's seat of the Malibu, where Melody was waiting in the driver's seat.

{¶ 4} Turner also exited the store and returned to his BMW, where he retrieved a handgun from the center console. Turner approached the passenger's side window of the Malibu and reached across Stewart with his left hand to grab an envelope (presumably containing either Stewart's paycheck or Turner's cash) while holding the gun in his right hand, pointed toward Stewart.

{¶ 5} At trial, the State played video recordings from the store's security cameras of Turner's and Stewart's encounters both inside and outside the store. Stewart testified that the Malibu "was already in reverse" when Turner walked up to the passenger side and reached inside. Stewart said that while the car was backing up, he and Turner "tussled" as Stewart tried to remove Turner's left arm from the Malibu's passenger window. Stewart claimed, however, that he never grabbed or touched the gun. He testified that the gun was in Turner's right hand with Turner's finger on the trigger. Stewart said that, as Melody shifted the Malibu into drive and pulled forward, he heard a gunshot, looked over, and saw Melody bleeding and unresponsive with her foot on the gas pedal. Stewart took the wheel of the moving vehicle and steered it into an intersection where he

---

[3] Although Stewart's cousin and appellant Turner share the same last name, they are not related. To avoid confusion, we will refer to Melody Turner by her first name.

managed to stop.

{¶ 6} Melody died as the result of a single gunshot to the head. Stewart promptly identified the shooter as Turner, whom police located a few hours later on Interstate 75 in Kentucky near the Tennessee border. The gun, which Turner claimed to have thrown into a grassy area somewhere along that highway, was not recovered.

{¶ 7} Testifying in his own defense at trial, Turner admitted having a dispute with Stewart about the paycheck. He also admitted retrieving a handgun from his BMW and approaching the passenger's side of the Malibu with the gun in his right hand. Turner stated that he only intended to "scare" Stewart into giving him back either the paycheck or the cash. Instead, with Turner's arm and upper body inside the Malibu, he and Stewart began to struggle over the weapon. Turner testified that Stewart grabbed the gun while the vehicle was moving and that the gun "just went off." Turner claimed that he "never intended to hurt anyone."

{¶ 8} On cross examination, Turner testified that he recently had acquired the gun for protection but did not realize that it was loaded. "I've never purchased any bullets. * * * I had never put any ammo in it. I never did anything. I [just] put it in the middle console." He also denied "racking" a round into the chamber and claimed that his finger was not on the trigger when the weapon fired.

{¶ 9} Mills, Turner's passenger, testified that upon exiting the store, Turner returned to his BMW and opened the center console before walking to the Malibu where Stewart was seated. She heard "a noise * * * like a cocking sound" – "like [he was] cocking his gun" – as Turner and Stewart argued. Mills saw the two men "tussling" through the car window. With Turner leaning into the Malibu, Mills heard Stewart tell the driver of the

Malibu "to pull off," then heard a gunshot.

{¶ 10} Mills recalled Turner's pulling his BMW alongside the Malibu after the shooting. As Stewart attempted to steer the Malibu from the passenger's seat, he told Turner that Melody was dead. According to Mills, Turner just kept demanding his money. Mills also testified that, after the shooting, Turner got back into his car and stated, "I don't know why I just did that."

{¶ 11} Detective Ronald W. Jordan of the Springfield Police Department testified that while investigating Melody's death, he viewed the surveillance video from outside the store where the shooting had occurred. He said that video depicted a man "with a firearm in his right hand" near a car identified as Turner's.[4] However, the detective did not identify the specific type of weapon shown.

{¶ 12} Based on his training and experience, Detective Jordan testified that some revolvers have "a cocking mechanism" that makes "[a] clicking sound" when the gun is cocked, while other, "single-action" revolvers do not need to be cocked in order to be fired. He further testified that a semiautomatic handgun cannot be fired until a bullet is loaded into the chamber by moving the "slide" back and forward again, which makes "a distinctive sound that anyone that's been around firearms recognizes * * *." Although he first described that sliding action as making "a clicking sound," he clarified that "I wouldn't necessarily say it's a click" when the slide moves forward. After simulating for the jury the motion that would be required to chamber a round in a semiautomatic weapon, Detective Jordan opined that the store videotape depicted Turner's arms positioned in a manner

---

[4] The State acknowledged during its closing argument that "it's not that great [quality] an image" (Tr. 642), but Turner confirmed that a still image taken from that video depicted him with a gun.

"similar" to what Detective Jordan had just demonstrated. On cross-examination, however, Detective Jordan confirmed that the weapon used in Melody's shooting never was recovered, and that no ammunition or gun-cleaning equipment was found during searches of Turner's residence and car.

{¶ 13} The State also called Detective Jordan as a rebuttal witness. Detective Jordan testified that a handgun has a trigger guard to help prevent inadvertent firing. He explained that "you would have to place your finger inside the trigger guard to depress the trigger," which moves "[b]ack towards the person that has it in their hand."

{¶ 14} The jury found Turner guilty of purposeful murder and felony murder with firearm specifications, felonious assault, tampering with evidence, and improper handling of a firearm in a motor vehicle. The jury acquitted him of aggravated murder. At sentencing, the trial court merged the purposeful murder, felony murder, and felonious assault offenses, and the State elected to proceed to sentencing on purposeful murder. The trial court imposed a prison term of 15 years to life for purposeful murder, with a three-year consecutive firearm specification. The trial court also imposed concurrent prison terms of 30 months for evidence tampering and 18 months for improper handling of a firearm in a motor vehicle, for an aggregate sentence of 18 years to life.

{¶ 15} Turner appeals that judgment, advancing four assignments of error. First, he challenges the legal sufficiency of the State's evidence. Second, he contends the trial court erred in permitting a witness to refresh her recollection with an unauthenticated document. Third, he asserts the trial court erred in failing to provide jury instructions on reckless homicide and involuntary manslaughter. Fourth, he claims that the trial court erroneously failed to conduct a hearing on his challenge to the racial composition of the

venire.

### *Turner's First Assignment of Error – Sufficiency of the Evidence*

{¶ 16} Turner first argues that the evidence presented by the State was not sufficient to prove every element of the offenses of purposeful murder, felony murder, and felonious assault. That assignment of error is not well taken.

{¶ 17} " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "Sufficiency" is essentially "a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 18} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

a. *Purposeful Murder*

{¶ 19} Having reviewed the trial transcript, we conclude that the evidence

presented, when construed in the light most favorable to the State, would be sufficient to prove beyond a reasonable doubt the elements necessary to support the jury finding that Turner was guilty of purposeful murder. R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶ 20}** "It is well-established that 'where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended.' " *State v. Esparza*, 39 Ohio St.3d 8, 14, 529 N.E.2d 192 (1988), quoting *State v. Jester*, 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (1987). "Such evidence is sufficient to allow a jury to find a purposeful intent to kill." *Id.*

**{¶ 21}** Here, Turner admitted to using a gun to "scare" Stewart, and the jury reasonably could have rejected his claimed ignorance that the gun was loaded.[5] Construed in the State's favor, the evidence was sufficient to support a jury determination that Turner acted purposefully in shooting Melody, in violation of R.C. 2903.02(A). His sufficiency of evidence challenge to his purposeful murder conviction therefore is overruled.

---

[5] Our conclusion does not detract from our analysis below regarding the trial court's failure to instruct the jury on the lesser included offense of reckless homicide. A jury presented with the option of finding Turner to have acted only recklessly might have concluded that he did not "purposely" cause Melody's death.

### b. Felony Murder/Felonious Assault

**{¶ 22}** While Turner also challenges the sufficiency of the evidence supporting the jury's guilty verdicts on the felony murder and felonious assault charges against him, we note that Turner was not actually *convicted* of those two offenses. "A conviction does not exist where there has been a guilty verdict * * * but no sentence." *State v. Croom*, 7th Dist. Mahoning No. 12 MA 54, 2013-Ohio-5682, ¶ 59, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12. Because the felony murder and felonious assault offenses were merged with Turner's purposeful murder conviction for purposes of sentencing, we need not address Turner's arguments regarding those merged offenses. *See id.* at ¶ 60-61 (as to merged offenses, "there exists no conviction for this court to vacate"); *see also State v. Zimmer*, 8th Dist. Cuyahoga No. 104946, 2017-Ohio-4440, ¶ 9, quoting *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 ("concerning merged offenses, if 'there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *' ").

**{¶ 23}** Turner's first assignment of error is overruled.

### Turner's Second Assignment of Error – Witness's Memory Refreshed

**{¶ 24}** In his second assignment of error, Turner challenges the trial court's decision to allow witness Jody Gartin to refresh her recollection using a 911 dispatch log. He contends that the State failed to establish that Gartin needed to have her recollection refreshed and failed to authenticate the dispatch log used as a "refreshing document."

**{¶ 25}** Upon review, we find no merit to either argument. On direct examination,

Gartin testified that she was in a parking lot when she heard a "pop" that sounded like a gunshot. She looked across the street and saw a young man enter a black BMW and speed away. She initially testified that this occurred at about 12:30 p.m., and that she then called 911 to report what she had seen. Asked if she would have given the 911 operator "an accurate time" when she called, Gartin responded, "Probably so." The prosecutor then approached Gartin with a dispatch log, to which defense counsel objected.

{¶ 26} After the trial court opined that Gartin had not indicated that she was having difficulty remembering, the following exchange occurred between the prosecutor and the witness:

Q. Ms. Gartin, about the time, as you sit here today, if you told the police or 9-1-1 something different at that time, would it have been more fresh in your memory at that point?

A. Yes.

Q. As you sit here today, are you for sure what time you would have left and made that phone – and told the police that it happened that day?

* * *

A. No, I'm not sure that would be the exact time.

Q. Would it help to see a memo of your recording of your 9-1-1 call, a memo of that call to the police?

A. Yes.

{¶ 27} Over defense counsel's objection, the trial court then permitted the prosecutor to use the call log (or memo) to refresh Gartin's recollection about when she

reported the incident. Gartin testified that it was at around 11:50 a.m. We see no error in the trial court's ruling.

{¶ 28} After silently reviewing the document, Gartin testified that it had refreshed her recollection as to when she reported the incident to police. Moreover, it was unnecessary to first authenticate the document. A writing used to refresh a witness's recollection is merely "a memory jogging device," not evidence, and authentication is not required because the document "has no substantive evidentiary significance." *State v. Carr-Poindexter*, 2d Dist. Montgomery No. 20197, 2005-Ohio-1571, ¶ 38.

{¶ 29} Furthermore, Gartin's testimony about the time of her 911 call was inconsequential to Turner's conviction. Turner did not dispute shooting and killing the victim, and his defense did not depend on the timing of that incident. Instead, his sole defense was that his gun "just went off" during a struggle. Because the timing of Gartin's 911 call had little or no relevance to the material issues in this case, any purported error in allowing Gartin to refresh her recollection (and we find no such error) would have been harmless. Turner's second assignment of error is overruled.

### Turner's Third Assignment of Error – Lesser Included Offenses

{¶ 30} In his third assignment of error, Turner claims the trial court erred by refusing to instruct the jury on the lesser included offenses of reckless homicide and involuntary manslaughter. Turner requested these instructions but the trial court found that the evidence, "taken as a whole," did not warrant giving them.

*a. Reckless Homicide*

{¶ 31} While a purposeful murder conviction requires proof that the defendant "purposely cause[d] the death of another," R.C. 2903.02(A), conviction of reckless

homicide requires a less culpable mental state, namely that the defendant "recklessly cause[d] the death of another." R.C. 2903.041(A). "A person acts purposely when it is the person's specific intention to cause a certain result," R.C. 2901.22(A), whereas "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). Thus, reckless homicide is a lesser included offense of murder. *State v. Hipshire*, 2d Dist. Darke No. 2010-CA-07, 2011-Ohio-3863, ¶ 36-38, citing *State v.* Wright, 4th Dist. Scioto No. 01CA2781, 2002-Ohio-1462, ¶ 24.

{¶ 32} Where the evidence presented by the defense, if believed, would support both an acquittal of the greater offense and a conviction on the lesser included offense, "the trial court [i]s *required* to charge the jury on the lesser included offense[ ]." (Emphasis sic.) *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶ 172, citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus ("Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense"). In other words, where the defendant is charged with purposeful murder, a court must instruct the jury on reckless homicide if the jury reasonably could find against the State on the element of purposefulness, but find for the State on the element of recklessness. *See Thomas* at 216.

{¶ 33} "In deciding whether to instruct the jury on a lesser-included offense, the trial court must view the evidence in a light most favorable to the defendant." (Citations

omitted.) *State v. Underwood*, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, ¶ 11. An instruction is not required whenever "some evidence" is presented to support a lesser offense. *State v. Callahan*, 2d Dist. Montgomery No. 24595. 2012-Ohio-1092, ¶ 33, quoting *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192. Rather, the evidence must be sufficient to enable the jury reasonably to reject the greater offense and to find the defendant guilty on a lesser, or inferior degree, offense. *Id.*

{¶ 34} In a case involving facts substantially similar to those before us, a jury did find the defendant guilty of the lesser included offense of reckless homicide. *See State v. Duncan*, 8th Dist. Cuyahoga No. 87220, 2006-Ohio-5009. The defendant in *Duncan* pulled out a handgun while seated in a car arguing with another man about money. *Id.* at ¶ 2. According to the defendant's testimony, he "only intended to scare [the other man]," but during the course of the argument, they "struggled for control of the firearm," which "accidentally went off," killing the other man. *Id.* The offenses charged in that case included aggravated murder ("purposely, and with prior calculation and design, cause the death of another," R.C. 2903.01(A)), but not purposeful murder ("purposely cause the death of another," R.C. 2903.02(A)). Still, the jury convicted the defendant of reckless homicide, "as a lesser included offense of aggravated murder." *Id.* at ¶ 3.

{¶ 35} The question, then, is whether reasonable jurors considering the evidence presented in this case could have found Turner not guilty of purposeful murder and guilty of reckless homicide. Based on the record, we conclude that they could.

{¶ 36} Here, Turner testified that he removed the handgun from the console of his BMW only to "scare" Stewart. Turner claimed that he only recently had purchased the gun and did not realize that it was loaded. He also denied "racking" a bullet into the

chamber and claimed that he never put his finger on the trigger. According to Turner, as he and Stewart struggled for the gun with Turner's head and upper body inside the car, the car began to move and the gun discharged, striking Melody. Mills likewise testified that she saw Turner and Stewart "tussling" through the passenger side window of Stewart's moving car when the shooting occurred. Stewart, too, confirmed that he and Turner were "tussling" when the gun discharged, although he denied that he grabbed Turner's gun. A police detective testified that video of the shooting did not show whose finger was on the trigger when the gun fired.

{¶ 37} Another Ohio appellate court has opined that a defendant "at least knowingly caused the victim's death by participating in a struggle over the gun" under the circumstances of that case. *See State v. Given*, 7th Dist. Mahoning No. 15 MA 0108, 2016-Ohio-4746, ¶ 67. However, the defendant in *Given* did not claim to have been unaware that the gun was loaded.[6] The differing circumstances of this case do not compel a conclusion that Turner acted more than recklessly by using what he denies knowing was a loaded gun.

{¶ 38} As we concluded above in discussing the sufficiency of the evidence to support Turner's purposeful murder conviction, a reasonable jury could choose to believe certain evidence and reject other evidence in order to find that Turner acted purposefully. Nevertheless, a reasonable jury construing the evidence in the light most favorable to Turner, *see Underwood*, 2d Dist. Montgomery No. 24595, 2016-Ohio-1101, ¶ 11, could have found that Turner did not know the gun was loaded, did not have his finger on the

---

[6] Instead, the dispute in *Given* centered on whether the victim or the defendant had drawn the gun over which they struggled. *See Given* at ¶ 7-8, ¶ 64-65.

trigger, and did not know that the car would move. On that basis, a reasonable jury could have concluded that Turner acted recklessly rather than purposely. Therefore, the trial court erred by failing to instruct the jury on the lesser included offense of reckless homicide. Turner's third assignment of error is sustained with respect to this argument.[7]

### b. Involuntary Manslaughter

**{¶ 39}** Turner's argument for an involuntary manslaughter instruction is not well taken, however. Involuntary manslaughter "is always and necessarily a lesser included offense of murder." *State v. Kidder*, 32 Ohio St.3d 279, 282, 513 N.E.2d 311 (1987). But in contrast to purposeful murder and reckless homicide, a conviction of involuntary manslaughter requires proof that the defendant "cause[d] the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony" or certain misdemeanors, without requiring a particular culpable mental state. R.C. 2903.04(A), (B).

**{¶ 40}** As applicable here, involuntary manslaughter in violation of R.C. 2903.04(A) requires causing the death of another as a proximate result of committing a felony. Turner advances two underlying felonies as possible support for an involuntary manslaughter instruction: (1) improper handling of a firearm in a motor vehicle, and (2) felonious assault. But the improper-handling offense occurred inside Turner's BMW, where the loaded handgun was stored in the center console. His improper handling of the firearm in his car

---

[7] The Double Jeopardy Clause would not preclude the State from retrying Turner for purposeful murder and/or the merged offenses of felony murder and felonious assault, because the evidence admitted at trial was sufficient to support his conviction. *See State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284. Moreover, "[c]onsistency in the verdict is not necessary." *State v. Handcock*, 2d Dist. Clark No. 2008 CA 85, 2009-Ohio-4327, ¶ 23, citing *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.995, ¶ 81. Accordingly, we would not be required to overturn a jury's verdict even if it reached inconsistent findings regarding Turner's state of mind. *See id.*

did not proximately cause Melody's death, which occurred after Turner retrieved the weapon from his car and pointed it through the window of her Malibu.

{¶ 41} Turner also could not rely on felonious assault to support an involuntary manslaughter instruction. Using felonious assault as the underlying felony would have duplicated the felony murder charge against Turner. "[I]f 'felonious assault is the underlying offense that causes the death of [a person], [then] felony murder is the proper charge,' and in such a case, a trial court does not err by refusing to charge a jury on involuntary manslaughter." *State v. Lynch*, 2d Dist. Montgomery No. 27620, 2018-Ohio-1424, ¶ 26.

{¶ 42} Because we agree with Turner that the trial court should have provided the jury with instructions regarding reckless homicide, Turner's third assignment of error is sustained in part. The portion of Turner's third assignment of error that relies on the trial court's failure to provide an involuntary manslaughter instruction is overruled.

### Turner's Fourth Assignment of Error – Racial Composition of Jury Venire

{¶ 43} In his fourth assignment of error, Turner contends that the trial court erred by failing to conduct a hearing after defense counsel challenged the racial composition of the venire. The record reflects the following discussion that occurred during a bench conference at the outset of voir dire, just after the trial court seated the first set of prospective jurors and alternates:

> [DEFENSE COUNSEL]: Judge, for the record, I would object to the array of this jury. I believe Mr. Turner is entitled to a jury of his peers. In this matter, as I look at the array of jurors here today – Mr. Turner is an African-American male, age 35. As I look at this jury, there's not one African-

American in the entire jury pool. I believe on its face, it's prejudicial towards him in that there are no jurors who seem to have any similar characteristics to him, particularly with regard to race. There are none in the first 18 in the box or in the gallery as I see it. Therefore, we would object to the array of the jury and ask for mistrial and ask that jurors of his peers [sic] be selected, including African-American jurors.

[PROSECUTOR]: He's not put forth a challenge regarding the procedures used to select jurors. My understanding, in Clark County that is done from the voter rolls, and nothing about that process is inherently prejudicial. It just so happens with this particular group of jurors that there does not appear to be any African-American members of the panel, but that in and of itself does not give rise to cause for mistrial.

[DEFENSE COUNSEL]: Judge, just for the record, I would question the procedures and the selection of jurors due to the total racial imbalance on this matter. Respectfully.

THE COURT: Thank you. For the record, the jurors are selected by a computer of the registered voters of Clark County. There is nothing in that draw which informs the Court or anyone involved in it as to a race of jurors. I do know that not all potential jurors showed up today. They will be summonsed [sic] to court to show why they should not be held in contempt, but there is nothing in our procedure that includes or potentially excludes any race. So the motion for mistrial is overruled.

{¶ 44} The Sixth Amendment's guarantee of a trial by jury "contemplates a jury

drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To establish a violation of that requirement, a defendant "must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." (Citations omitted.) *State v. McNeil*, 83 Ohio St.3d 438, 443-444, 700 N.E.2d 596 (1998). A defendant who challenges the racial composition of his or her jury bears the burden of proving systematic exclusion. *See Columbus v. Bryant*, 10th Dist. Franklin Nos. 76AP-117 to 76AP-124, 1977 WL 200264, *4 (June 30, 1977) ("defendants have not met their burden [of] showing a systemic exclusion of all blacks").

{¶ 45} Here, defense counsel initially challenged only the absence of African-Americans in Turner's own jury pool. Underrepresentation of a distinctive group on a single venire "is not *systematic* exclusion" for purposes of a Sixth Amendment claim, however. (Emphasis sic.) *McNeil* at 444, citing *Duren v. Missouri*, 439 U.S. 357, 366, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (systematic exclusion demonstrated where "gross discrepancy" between distinctive groups within jury venire shown to exist "not just occasionally but in every weekly venire for a period of nearly a year"). After the prosecutor pointed out the applicable standard, defense counsel "question[ed] the procedures and the selection of jurors due to the total racial imbalance on this matter." Still, challenging the jury-selection process based on the racial composition of a single venire does not evidence systematic exclusion.

{¶ 46} Significantly, at no time did defense counsel contend that the jurors in

Turner's case had been selected on any basis other than a computerized draw from among "the registered voters of Clark County." "The use of voter registration rolls as exclusive sources for jury selection is constitutional and 'does not systematically, [or] intentionally, exclude any [economic, social, religious, racial, political and geographical group of the community].' " *State v. Moore*, 81 Ohio St.3d 22, 28, 689 N.E.2d 1 (1998), quoting *State v. Johnson*, 13 Ohio St.2d 106, 114, 285 N.E.2d 751 (1972). Absent any evidence of systematic exclusion of African-Americans in Clark County's jury selection process, the trial court did not err by failing to hold a hearing on that issue.[8] Turner's fourth assignment of error is overruled.

### *Conclusion*

**{¶ 47}** The judgment of the Clark County Common Pleas Court will be reversed as to Turner's purposeful murder conviction only and affirmed as to all other convictions; this matter will be remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurring in part and dissenting in part:

**{¶ 48}** I agree that the first, second, and fourth assignments of error should be overruled for the reasons detailed in the majority opinion. Regarding the third assignment of error, I disagree that the trial court erred by denying Turner's request for a lesser included instruction on the offense of reckless homicide.

**{¶ 49}** At trial the defendant requested a reckless homicide instruction after the

---

[8] Notably, defense counsel never requested such a hearing.

close of all the evidence. (Tr. 613). The trial court considered the arguments and the cases presented by the defense over that evening and issued a two-page written decision the next morning. (Doc. #27). In that decision, the court recited and applied the correct legal standards for evaluation of a lesser included instruction. Therefore, the only question before us is whether the trial court abused its discretion by declining to give the instruction. On this record, I think not. In my opinion, the case law cited by the majority does not support the instruction, the trial court did not abuse its discretion by denying the requested instruction, and there was no evidence of reckless behavior to support that instruction.

## ADDITIONAL FACTS

{¶ 50} To adequately evaluate the requested lesser-included offense instruction, additional facts are necessary, as well as recognition of where those facts are found in the record. Some of the facts in the majority opinion are included here to provide context for the additional information.

{¶ 51} The initial confrontation between Tevius Turner and Evan Stewart occurred inside the Springfield Quality Inn where Turner was the manager and Stewart was a recently-fired employee. Stewart testified that he owed Turner some money for a loan, and Turner wanted Stewart to sign over his final paycheck in exchange for some cash in an envelope, which Stewart said was "the remaining sum * * * of what I owed him out of my check." (Tr. 240). Both the check and cash were given to Stewart at the front desk while Stewart was arguing with Turner, contending that he had been fired unlawfully. (*Id.* at 244). A video surveillance recording without audio (Exhibit #89) corroborates the disagreement at the front desk and shows that, after a while, the two men went to Turner's office to further discuss the matter, apparently because the heated discussion in the lobby

occurred while customers were coming and going. Stewart said he offered the cash back to Turner but "[h]e didn't want the cash. He just wanted my check." (Tr. 247).

{¶ 52} Many minutes later, the video shows Turner leaving the office and heading away from the lobby toward the dining hall. Shortly thereafter, Stewart leaves the office and walks out through the lobby with the check and cash in hand. Stewart proceeded to a nearby convenience store to cash the check.

{¶ 53} Upon discovering that Stewart was gone, Turner, who said he had driven Stewart to a place to cash his check before, asked another employee to show him where that place was because he remembered the store but did not know its location. Turner had employee Leanna Mills go with him. The hotel video shows them hurrying out of the hotel to go after Stewart.

{¶ 54} Mills testified that once they were at the convenience store, she remained in Turner's car scrolling through Facebook while Turner went inside. (*Tr. 347.*) Turner then came out of the store, he got something out of the center console, and he started toward Stewart's car. (*Id*). When Turner was back outside of his car, Mills heard a noise that "was like a cocking sound." (*Id*. at 348). She testified: "Well it kind of got my attention. I didn't know what it was at the time, but it was like him cocking his gun." (*Id*.). After the shot was fired and Turner returned to his car, "[h]e set [the gun] on his lap." (*Id*. at 349). He drove in the same direction Stewart's vehicle went and "pull[ed] up beside [Stewart]." Stewart was crying and saying, "I can't believe you shot my cousin." (*Id*. at 351). Turner responded, "Just pull over. I want my money." (*Id*. at 352). According to Mills, Turner soon pulled away and "[h]e said he couldn't believe that he just did that. He needed to get out of town and told me that he needed my help." (*Id*. at 353).

{¶ 55} Exhibit 92, a timeline compilation recording of various surveillance video cameras at the convenience store (without audio), was played for the jury. The video included a recording of the outside of the store where Turner parked his car and a partial view of when and how the shooting occurred. Stewart was still inside the store at the counter when Turner arrived in his car. Turner parked askew next to the car in which Stewart had been riding, entered the store, and confronted Stewart. Turner gestured with his hand for Stewart to give him either, or perhaps both, the check and cash. Stewart apparently refused. They both left the store arguing, with Turner exiting first. Turner quickly opened his car door and reached into the center console area, retrieving a handgun and stepping toward the car where Stewart was in the passenger seat.

{¶ 56} Detective Ronald Jordan had been with the Springfield police division for twenty years, had been a detective for fourteen years, and had been a member of the SWAT team for nearly fifteen years. (Tr. at 466-467, 497). Jordan explained that loading a magazine into a semi-automatic weapon does not load a cartridge into the chamber and it would not be ready to fire. He described how a round is loaded and testified that the motion of the slide when a round is chambered makes a "distinctive sound that anyone that's been around firearms recognizes that sound." (*Id.* at 500). Detective Jordan was permitted to demonstrate with his hands the movements used to chamber a round. (*Id.* at 504). Jordan observed the parking lot video and a print copy of a still frame showing Turner with both hands on the weapon. (Exhibit 76).[9] Jordan then opined that the hand movements used to chamber a round appeared to be similar to the positioning of Turner's

---

[9] The prosecutor represented that the video only records a couple of frames a second. (Tr. 494). Therefore, it does not display an entirely smooth continuous recording.

body in the video. (*Id.* at 504).

{¶ 57} Stewart testified that, when Turner approached him in the car, "[h]e reaches in to grab the check with the firearm in the other hand pointed at me." (*Id.* at 256). The gun was in Turner's right hand. (*Id.*). "He repeatedly asked for the check." (*Id.*). Stewart never grabbed, manipulated or touched the firearm. (*Id.* at 257). Turner always had the weapon "controlled in his right hand." (*Id.*). While Turner remained at the window grabbing for the check, the driver, Stewart's cousin, backed out, put the vehicle in drive, and was starting forward when the shot went off. (*Id.* at 258). Turner had his finger on the trigger when the gun went off. (*Id.*).[10] The only person who had the gun at that point was Tevius Turner. (*Id.* at 260). Stewart later was asked to demonstrate and, while apparently doing so, he said: "He proceeded to grab the check with his left and he was still brandishing a firearm with the right." (*Id.* at 270). On cross examination, defense counsel asked if Stewart and Turner were "tussling" (counsel's word): "And you guys begin to tussle, correct, as this car backs up. Correct?" Stewart responded, "Yes." (*Id.* 292). Immediately thereafter though counsel asked, "He's reaching for the check, and you're tussling with him over the gun and the check, Correct?" Steward responded, "No not over the gun. The gun is near his right side and his …." *Id.* Stewart's answer was cut off with another question. After an objection was sustained, Stewart was asked, "So you guys are tussling from where the car was parked back into the middle of the parking lot. Correct?" Stewart responded, "Yes." (*Id.* at 292-293). Defense counsel then asked, "And it was during this tussle that a gun fired. Correct?" Stewart responded, "No, the car was in forward when

---

[10] The precise question to Stewart was "do you know or recall if he had his finger on the trigger when that went off?" The answer was "Yes." But in context, Stewart's testimony is that Turner had his finger on the trigger when the shot was fired.

the shot was fired." (*Id.* at 293). In short, Stewart consistently denied "tussling" over the gun or even with Turner's right arm or hand.

{¶ 58} With Melody shot in the head and apparently unconscious, her foot remained on the accelerator, and the car proceeded over a curb and out into the road. Stewart tried to steer the car from the passenger seat. The video shows Turner's car leaving the lot in the same direction and both cars then moving out of sight. Stewart testified, consistent with Leanna Mills, that Turner pulled his car alongside and "asked me to pull over." (*Id.* at 295). Turner then left, and Stewart was able to put the car into park.

{¶ 59} At this point in the trial, when the State rested, there was absolutely no evidence to support the notion that a reckless homicide instruction should be given for any of the three murder charges. Consequently, if such an instruction were appropriate, of necessity it would have been predicated on Turner's testimony.

## TURNER'S TESTIMONY

{¶ 60} Turner testified that when he got the weapon out of the car he told Leanna Mills he was about to scare Stewart. (*Id.* at 574). That was not corroborated in Mills' testimony, but neither counsel asked her about such a statement. Turner said he went to Stewart's car and "was reaching for an envelope that was, actually looks like it was between a bottle and something else in the middle console." (*Id.* at 575). "[Stewart] reaches over and grabs the gun in my other hand and we begin to struggle." (*Id.*) Turner testified that as he and Stewart struggled and the vehicle began to move, "[t]he gun went off. The gun just went off." When asked whether he intentionally or purposely try to shoot anyone, Turner responded, "No. No. I never intended to hurt anyone." (*Id.*).

{¶ 61} Turner testified that he then panicked. He went back to the hotel, hurriedly

packed, and headed to see family in Georgia, a trip he said he already had planned for some time. On the way down Interstate 75, he threw the gun into a grassy area. (*Id.* at 578). When direct examination ended, Turner had yet to claim he did not know the weapon was loaded.

**{¶ 62}** On cross examination, Turner was asked, "You had a gun in your car that was a loaded firearm. Correct?" (*Id.* at 579). His reply was the first mention of ammunition: "I didn't know that it was loaded." The question about whether he had a loaded gun in the car was asked again, and he replied, "Obviously." (*Id.* at 580). He testified that he bought the gun for his safety because he had received several threats from ex-employees. He had had it for about two weeks, but never purchased bullets for the gun, although he "did know how to work it." (*Id.* 582). Such operational knowledge was confirmed by his response to the question, "So that isn't you racking that gun on the way to that car?" Turner replied, "I did not rack the gun, sir." (*Id.* at 589). When asked about State's Exhibit 76, the still frame where he had the weapon in his right hand and he also put his left hand on the weapon, he denied he was racking a round in the chamber. (*Id.* at 583). Rather, he said, "I actually put the gun in my hand so I can grab the bottom handle. I did not even have my hand on the trigger. I just pushed it in my hand and had it in the car when I was in the car. My finger was not even on the trigger." (*Id.* at 584). The following exchange then occurred between the prosecutor and Turner:

Q. Your finger was not on the trigger?

A. No.

Q. So you didn't even pull that trigger?

A. No. Sir.

Q. Whose hand was on the trigger?

A. We was struggling. Both of our hands was on the gun.

Q. "But yours wasn't on the trigger?

A. No.

(*Id.* at 584).

{¶ 63} Turner testified that "[a]s the car moved forward, the gun discharged." (*Id.* at 599). Throughout all of his testimony, Turner never said Stewart's hand or finger was on the trigger or that Stewart caused the weapon to fire.

{¶ 64} Turner stated that after leaving the convenience store parking lot he drove beside Stewart but, contrary to Stewart's and Mills' testimony, "I didn't pull up beside him." (*Id.* at 591). Turner further denied he said anything to Stewart or asked him for the money or to pull over, as both Stewart and Mills testified. (*Id.*). Turner also denied that he knew anyone was shot but said he panicked and fled because the gun went off. (*Id.* at 592). He also claimed he did not know anyone was shot when he discarded the gun along the highway, explaining "[b]eing that the gun went off, I didn't want it." (*Id.* at 593).

## *STATE V. DUNCAN* IS NOT PRECEDENT FOR THE PROPOSITION THAT A RECKLESS HOMICIDE INSTRUCTION SHOULD HAVE BEEN GIVEN.

{¶ 65} The majority cites *State v. Duncan*, 8th Dist. Cuyahoga No. 87220, 2006-Ohio-5009, as a "substantially similar" case in which a jury found the defendant guilty of reckless homicide. But the case is not similar. If anything, it supports the notion that a death resulting from struggling over a firearm constitutes felony murder.

{¶ 66} In *Duncan*, the victim, Frederick Futrell, agreed to cash a check that Duncan had stolen in exchange for $100, but afterward Futrell wanted a larger cut of the proceeds.

Duncan pulled out a pistol. "According to [Duncan], he only intended to scare Futrell; however, during the course of the argument, he and Futrell struggled for control of the firearm and the gun accidentally went off." *Id.* at ¶ 2. Futrell died. Duncan was charged with aggravated murder, R.C. 2903.01(A) (purposefully with prior calculation and design), felony murder, R.C. 2903.02(B) (cause death as result of first or second degree felony), and two counts of aggravated robbery, R.C. 2911.01(A)(1). The trial court *did* instruct on reckless homicide as a lesser included offense of the aggravated murder count. The jury found Duncan guilty of reckless homicide "as a lesser included offense of aggravated murder," but it also found him guilty of felony murder and the aggravated robberies. *Id.* at ¶ 3. Because the jury found Duncan guilty of felony murder, *of necessity* it also would find him guilty of reckless homicide, which is also a lesser included offense of felony murder.

{¶ 67} Ohio's hierarchy of culpable mental states means that when a defendant commits an offense with a higher culpable mental state than a statute requires, he has committed the offense and also has committed the degree of the offense or lesser included offense with a lower mental state. "When recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." R.C 2901.22(E). Inversely, then, purpose includes knowledge, knowledge includes recklessness, and recklessness includes negligence. Therefore, the "knowledge" mental state required for the *Duncan* jury's felony murder verdict included and subsumed the recklessness required for the death caused by recklessness, i.e. the reckless homicide. In light of the felony murder conviction, the only logical conclusion was for the jury to have found him guilty of reckless homicide.

{¶ 68} *Duncan* is an example of how a jury could choose reckless homicide instead

of purposeful prior-calculation-and-design murder. It does nothing to help analyze the factual scenario here where a jury has chosen to find one guilty of both purposeful aggravated murder and knowledgeable felony murder. The jury here found Turner not guilty of prior-calculation-and-design aggravated murder. It just did not have the option of the lesser offense of reckless homicide to that offense. But that matters not because if it had been given that option, to be logically consistent it also would have found Turner guilty of reckless homicide, as the jury did in *Duncan*, due to the culpable mental state hierarchy. The salient question is whether Turner's jury should have had the option of reckless homicide to the exclusion of purposeful aggravated murder or knowledgeable felony murder. That question is not answered by *Duncan*, so the case does not provide guidance here.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DECLINING

## TO GIVE A RECKLESS HOMICIDE INSTRUCTION FOR THE

## OFFENSES OF PURPOSEFUL MURDER OR FELONY MURDER

{¶ 69} A trial court is not required to give a lesser included instruction just because a defendant raises "some evidence" to support the lesser charge. In *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, the defendant testified that he merely fired shots into the ground and did not intend to shoot anyone. But two people were struck by bullets and one died. Hubbard was charged with aggravated murder and felony murder (proximate result of felonious assault) regarding the decedent, and attempted murder and felonious assault regarding the survivor. The jury was unable to reach a verdict on aggravated murder, a charge that was later nolled. Hubbard was convicted of felony murder, firearm specifications, attempted murder, and felonious assault.

{¶ 70} On appeal, there were procedural inadequacies with Hubbard's claim that he should have received several lesser included instructions. But the Tenth District "encouraged both parties to present arguments regarding the trial court's failure to instruct the jury on the lesser-included offense of reckless homicide." Further, "in the interest of justice," the appellate court agreed to "address defendant's fifth assignment of error only as it relates to reckless homicide." *Id.* at ¶ 34. In addition, plain error review applied because the instruction had not been requested.

{¶ 71} Nonetheless, the appellate court observed that " 'a defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction.' * * * Even though the defendant's own testimony may constitute some evidence supporting a lesser offense, if the evidence on whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense, the court should not instruct on the lesser offense." (Citations omitted) *Id.* at ¶ 41. The Tenth District then noted that the rest of the evidence was contrary to Hubbard's assertion that he fired at the ground and that there was no testimony or physical evidence to corroborate his statements. Under those circumstances, it was not plain error to fail to give a reckless homicide instruction.

{¶ 72} Here, Turner's testimony about an unloaded gun aptly can be described as an afterthought not raised until cross-examination. There is no physical or testimonial evidence of corroboration. All other evidence in the case supports an inference and conclusion that Turner *did* know his gun was loaded: he testified that he kept the gun in his car for protection (which would require the gun to be loaded), he knew how to operate the weapon, he bought the gun two weeks earlier but implausibly claimed he never

determined there was ammunition in it, his passenger heard a "cocking" sound just before the gun discharged, a video appeared to show him chambering a round just before the shooting, he did not act shocked or surprised after shooting the victim, and he fled Ohio and discarded the weapon. After hearing the evidence—including the videos, the still frames, the blow-up portions thereof, the testimony of Leanna Mills, Evan Stewart, and Detective Jordan, the display about ratcheting a round in the chamber and the nature of a trigger guard on a handgun, and the fact that Turner tracked down Stewart and was grabbing the paycheck as the car moved—the trial court reasonably could have concluded that the only reasonable interpretation of the evidence was that Turner chambered a round in the weapon as he approached Stewart, that he knew the weapon was loaded and ready to fire, and that he acted purposely and knowingly in firing the weapon and killing Stewart's cousin Melody. Accordingly, it was not an abuse of discretion for the court to decline to give a reckless homicide instruction.

**INTERPRETING TURNER'S TESTIMONY MOST FAVORABLY TO HIM, THE UNLOADED GUN THAT "JUST WENT OFF" WITHOUT ANYONE'S FINGER ON THE TRIGGER DESCRIBES AN ACCIDENT AND NOT RECKLESS HOMICIDE.**

**{¶ 73}** Case law supports the denial of the reckless homicide instruction. In *State v. Evans,* 7th Dist. Mahoning No. 00 CA 93, 2002-Ohio-3047, Evans got a gun out of his car and approached Jason Jenkins, with whom he was having an argument. Although there was testimony to the contrary, Evans said that "Jason grabbed appellant's arm. Appellant pulled away. Appellant testified that as he pulled away, the gun just went off." *Id.* at ¶ 5. Jason was shot but survived. Evans was charged with felonious assault with a firearm specification. He requested an instruction on the lesser included offense of

negligent assault. The trial court, applying the proper standard, declined to give that instruction, indicating that either Evans acted knowingly or the whole incident was an accident. The court of appeals agreed:

> Appellant testified that the gun just "went off." Jason and [another witness] testified that appellant pointed the gun at Jason and shot him. Nowhere did anyone testify that appellant negligently handled the gun or failed to perceive or avoid a risk. Thus, it is apparent that the evidence adduced at trial did not reasonably support a charge of negligent assault.

*Id.* at ¶ 31. If a negligent homicide instruction is not appropriate in the case of an accident when a gun "just goes off," then certainly an instruction on a higher culpable mental state, recklessness, should not be given when an unloaded firearm just goes off unless there is some other evidence of reckless behavior.

**{¶ 74}** The difference between reckless and negligent conduct was explained in *State v. Peck,* 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263 (10th Dist.). Peck, a tow truck driver, was convicted of reckless homicide. He was using an underrated snatch block on his tow trucks, which broke and catapulted into a passing vehicle, killing that driver. The court held that the evidence did not prove that Peck knew of the risk associated with his conduct. Because he was unaware that he was using the wrong equipment, the evidence did not support his conviction for reckless homicide. The *Peck* court explained: "A mere failure to perceive or avoid a risk, because of a lack of due care, does not constitute reckless conduct." (Citation omitted.) *Id.* at 29. "The reckless actor is aware of the risk and disregards it; the negligent actor is not aware of the risk but should have been aware of it." *Id.* at 30, citing *Wharton's Criminal Law* (15th Ed.1993), Section

27, 170. To evaluate whether actions constitute reckless behavior, a court must "assess the defendant's knowledge of the specific risk created by the defendant's conduct, not the defendant's knowledge of the general risk inherent in the activity, in determining criminal liability for reckless homicide. Otherwise, there could be criminal liability for even negligent conduct whenever the defendant is aware that he is engaged in an inherently dangerous activity." (Emphasis added.) (Citation omitted.) *Id.* at 31.[11]

**{¶ 75}** Here, interpreting the evidence most favorably to Turner, there was no evidence of recklessness. If his testimony were believed, he did not know the weapon was loaded. He had no intention of hurting anyone. His finger was not on the trigger, and he did not testify that Stewart's was either. He threw the gun away because "[b]eing that the gun went off, I didn't want it." That describes a weapon that malfunctioned on its own, not one that was fired, intentionally or otherwise. That describes an accident, not reckless handling.

**{¶ 76}** In *State v. Rohdes,* 23 Ohio St.3d 225, 492 N.E.2d 430 (1986),[12] Fred Rohdes killed Paul Boysel with one shot from a handgun. The two were arguing in Rohdes' house when Rohdes picked up a handgun and displayed it. Boysel went outside, and Rohdes followed. Rohdes "testified that he slipped in the snow or tripped over some

---

[11] R.C. 2901.22(C), the "recklessly" definition, was amended effective 3-23-15. The "disregards a 'known risk' " was changed to "disregards 'a substantial and unjustifiable risk.' " In a civil case, we have commented that the new statutory language was not a "significant distinction" from the old version. *Brewer v. Dick Lavy Farms, L.L.C.*, 2016-Ohio-4577, 67 N.E.3d 196, ¶ 21, fn. 1 (2d Dist.).

[12] Rohdes was modified regarding analysis of involuntary manslaughter as a lesser offense in *State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987). That does not affect the analysis here.

other object in his house slippers, and the resultant shooting was an accident." *Id.* at 225. Rohdes was charged with murder, and at trial the State requested an instruction on involuntary manslaughter by the misdemeanor of menacing. That instruction was given. Rohdes requested a lesser instruction on negligent homicide. That was not given. He was convicted of involuntary manslaughter. The court of appeals reversed, but appeal was allowed on a motion and cross motion for leave to appeal in the Ohio Supreme Court. Of relevance here, the Ohio Supreme Court analyzed whether an instruction on negligent homicide should have been given.

**{¶ 77}** The Ohio Supreme Court reinstated the involuntary manslaughter conviction. In so doing, it also concluded that a negligent homicide instruction was not required. "[T]he evidence does not, even when construed most favorably to the appellee, present any fact pattern on which a trier of fact could reasonably find appellee guilty of negligently causing the death of another by means of a deadly weapon. Slipping or tripping in the snow, if believed by the jury, is an accident, not the substantial lapse from due care required under R.C. 2903.05 to establish negligence." *Id.* at 228. If a court should not give a negligent homicide instruction when an accident is described, certainly a reckless homicide instruction should not be given when the defendant's evidence describes an accidental misfiring of a weapon believed to be unloaded.

**{¶ 78}** In a case similar to the one before us, *State v. Easley,* a defendant was charged with attempted murder and two counts of felonious assault in addition to firearm specifications and a weapons charge. Pertinent here, the defendant requested an instruction on attempted reckless homicide. This following passage encapsulates the rest of the story:

* * * [A]ppellant provided no evidence to demonstrate his being reckless in the shooting incident against Woods. Instead, *appellant claimed that the gun discharged accidentally during a struggle.* Reckless conduct goes beyond what is considered to be an accident. *State v. Martin*, Franklin App. No. 07AP-362, 2007-Ohio-7152, at ¶ 53. Indeed, an accident claim is inconsistent with recklessness; accident is an unintentional act that denounces a culpable mental state. *State v. Fears*, 86 Ohio St.3d 329, 340, 1999-Ohio-111; *State v. Barnd* (1993), 85 Ohio App.3d 254, 260; *State v. Skeens*, Noble App. No. 286, 2001-Ohio-3476. Given that appellant claimed an accident here, and not reckless conduct, and in light of the above-noted evidence otherwise establishing appellant's purposeful conduct in shooting Woods, we do not find under any reasonable view of the evidence that the jury could have found appellant not guilty of attempted murder, but guilty of attempted reckless homicide.

(Emphasis added.) *State v. Easley*, 10th Dist. Franklin No. 07AP-578, 2008-Ohio-468, ¶ 60; *see also State v. Wyatt*, 12th Dist. Butler No. CA2010-07-171, 2011-Ohio-3427, citing *Easley* (court held that a reckless homicide instruction not required where defendant testified his wife was shot in the back of the head when a "sudden movement" caused the gun to discharge when he went to hug his wife. Although appellant claimed the shooting was accidental, "[r]eckless conduct goes beyond what is considered to be an accident.").

{¶ 79} Here there was no testimony about the risks associated with pointing a firearm in the direction of a human being, unloaded or otherwise, and no testimony about firearm safety or verification of whether a weapon was inoperable, none. There was no

testimony from Turner, on either direct or cross examination, from which one could evaluate whether he contemplated, recognized, knew of, or appreciated a risk that his actions involving an unloaded weapon might result in an unintended and uncaused misfire, none. To the contrary, Turner described an accidental misfire of a weapon he believed was not loaded. Without evidence of reckless conduct, a reckless homicide instruction properly was excluded.

{¶ 80} I would affirm the judgment of the trial court.

. . . . . . . . . . . . .

Copies mailed to:

Andrew R. Pickering
Chris Beck
Hon. Richard J. O'Neill