[Cite as *State v. Kelly*, 2024-Ohio-1612.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29774 |
| | : | |
| v. | : | Trial Court Case No. 2018 CR 04548 |
| | : | |
| GARY KELLY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 26, 2024

. . . . . . . . . . .

KRISTIN L. ARNOLD, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Gary Kelly was found guilty after a bench trial in the Montgomery Court of Common Pleas of gross sexual imposition and public indecency based on conduct that occurred in 2018 with M.D. In a separate jury trial, he was found guilty of three counts of rape, one count of attempted rape, and six counts of gross sexual imposition stemming from his conduct with two sisters, A.M. and L.M., between 1987 and

1993. With one exception, each count alleged that the victim was younger than 13 years old when the conduct occurred. The trial court found that Kelly was a sexually oriented offender, a Tier III sex offender, and a sexually violent predator, and it sentenced him to a combination of definite and indefinite sentences totaling 15 years to life in prison.

{¶ 2} Kelly appeals from his convictions. He claims that the trial court should have dismissed the charges related to A.M. and L.M. as outside the statute of limitations, that his trial counsel was ineffective for withdrawing his motion to suppress, that the court should have granted his Crim.R. 29(A) motion on the counts related to M.D., and that the court made various evidentiary errors during the bench and jury trials. For the following reasons, the trial court's judgment will be affirmed as to Counts 5-10 (L.M.) and Counts 14 and 16 (M.D.) and vacated as to Counts 1-4 (A.M.).

## I. Facts and Procedural History

{¶ 3} In the late 1980s and early 1990s, when he was in his early 20s, Kelly resided with family friends in a residence in Moraine. The family consisted of parents and three children: a son, E.M. (born 1977), and daughters A.M. (born 1978) and L.M. (born 1981). Kelly worked for the children's father and slept primarily in the son's attic bedroom. For several months in 1990 and 1991, the mother's friend, Tamara, and her children also lived with the family. After a separate unit in the building became available for rent, Tamara moved next door and resided there for a year and a half to two years. Tamara observed several incidents between Kelly and A.M. that she thought were inappropriate, though she did not notice anything regarding Kelly and L.M. At some point, A.M. told her mother that she had been molested and raped by Kelly, and they went to the police.

{¶ 4} There is conflicting evidence about when the police were first notified of Kelly's behavior. According to A.M.'s and Tamara's jury trial testimony, in the fall of 1991, A.M. came downstairs in the early morning and told her mother about Kelly's conduct. When Kelly returned from work that evening, the family kicked him out of their home. A.M. and her mother went to the Moraine police department to report Kelly's behavior the same day.

{¶ 5} In early August 1993, Kelly sexually assaulted A.M.'s friend, J.C., and the girls separately went to the Moraine police department to report Kelly's conduct. On August 7, 1993, A.M. disclosed that Kelly had repeatedly touched her privates, masturbated in front of her, touched her bottom, and licked her stomach in September 1991. The narrative section of the police report indicated that A.M. had confided in her mother the night before coming to the police, August 6, 1993. J.C. filed a police report on August 8, 1993. A.M.'s mother communicated to the Moraine police in September 1993 that she wanted to have Kelly prosecuted, but it appears little investigation was conducted, and the allegations did not lead to any charges at that time.

{¶ 6} In 2018, Kelly lived in a single-family home in Dayton with his longtime girlfriend, Tracy Hall, and his adult daughter. In March 2018, Cheyenne Shelton, who had previously lived with Kelly and Hall in an informal foster arrangement, moved back into their home. While there, Shelton babysat several of her friends' children, including four-year-old M.D. M.D. often stayed with Shelton for the weekend and had regular contact with Kelly.

{¶ 7} On July 7, 2018, M.D. told her mother that Kelly "showed her his wee wee"

and had her touch it. M.D.'s mother went to her sister's home, which was nearby, and M.D. made similar statements to her aunt. Later that day, M.D.'s mother contacted law enforcement. A police investigation ensued, and M.D. was interviewed by CARE House and referred for therapy. Kelly agreed to be interviewed by Detective Joshua Spears, and he traveled to the police station for an interview on August 7, 2018.

{¶ 8} During the course of his investigation, Detective Spears learned of other potential victims, including A.M. The investigation led to new disclosures by A.M.'s sister, L.M.

{¶ 9} On December 7, 2018, Kelly was indicted on two counts of gross sexual imposition (under 13) and one count of public indecency, all related to his conduct with M.D. Later that month, Kelly moved to suppress his statements to the police, claiming a violation of his *Miranda* rights. Defense counsel withdrew the motion to suppress on February 1, 2019, prior to any hearing on the motion.

{¶ 10} On April 11, 2019, the State filed a 16-count superseding indictment alleging six counts related to A.M. (five rapes and one attempted rape, Counts 1-6), seven counts related to L.M. (one rape and six gross sexual impositions, Counts 7-13), and three counts related to M.D. (two gross sexual impositions and one public indecency, Counts 14-16). Count 6, one of the rape charges regarding A.M., alleged a violation of R.C. 2907.02(A)(2) involving force or threat of force. The other rape, attempted rape, and gross sexual imposition counts all alleged that the victim had been under the age of 13. The two gross sexual imposition counts regarding M.D. also included sexually violent predator specifications. The State subsequently dismissed the original indictment. Kelly waived

his right to a jury trial, and a bench trial was scheduled for October 21, 2019.

{¶ 11} Numerous motions were filed during the pendency of Kelly's case. On September 23, 2019, the State filed a notice of intent to introduce the statements M.D. had made to her mother, therapist, and the CARE House forensic interviewer pursuant to Evid.R. 807 and 803(4) if M.D. were unavailable at trial. The State indicated that "[t]he potential unavailability of M.D. is based upon the fact that, given her young age, there is a possibility that she may not be found competent to testify at trial, or simply may be unable to testify when faced with the pressures of trial." On September 26, 2019, the court determined that M.D. was competent to testify. However, it scheduled a hearing on the State's Evid.R. 807 motion, and the trial was continued until March 2020.

{¶ 12} On February 21, 2020, Kelly moved to sever the original three charges concerning M.D. (Counts 14-16) from the 13 counts concerning A.M and L.M. The trial court granted the motion, and the trial on Counts 14-16 was set for the week of March 16, 2020. Kelly requested a bench trial for those charges.

{¶ 13} On March 12, 2020, Kelly filed a motion in limine seeking to prevent the State from introducing evidence of prior bad acts, specifically evidence related to Counts 1-13, including all information, testimony, and evidence related to those allegations, Kelly's police interview in which those acts were discussed, and questions of defendant about prior bad acts for which he had not been convicted or tried.

{¶ 14} On March 16, 2020, the court filed an agreed entry regarding M.D.'s statements. The order identified M.D.'s mother, her aunt, and the forensic interviewer who had witnessed statements by M.D. The order stated that, "[a]t the [Evid.R. 807]

hearing, the parties agree that – in the event that the child victim is deemed 'unavailable' at trial, and if the other conditions of Evid.R. 807 are properly met, the statements offered by the above-listed witnesses would be properly admissible under Evid.R. 807. This agreement does not limit any other applicable rules of evidence which may apply to the same statements, and reflects only the parties' agreement with regard to Evid.R. 807."

{¶ 15} The next day, however, Kelly moved to continue the bench trial due to the COVID-19 pandemic. The trial court granted the motion and rescheduled the bench trial for August 17, 2020. A few days before the scheduled bench trial, the court filed an amended entry regarding Evid.R. 807 statements. The amended agreed order provided that if M.D.'s testimony were "not reasonably obtainable" under Evid.R. 807(B), the parties stipulated that the remaining Evid. 807 requirements were satisfied and M.D.'s statements would be admissible. However, the trial date was again continued.

{¶ 16} On October 27, 2020, Kelly filed an amended motion in limine to exclude prior bad acts, which sought to preclude the State from presenting evidence of certain conduct between Kelly and M.D., along with his behavior with other victims. At a pretrial conference, the State agreed to Kelly's motion.

{¶ 17} The bench trial on Counts 14 to 16 ultimately was held in May 2021. The State called ten witnesses, the first of which was M.D. After questioning by the State, the State moved for M.D. to be declared unavailable under Evid.R. 807. The motion was granted over defense counsel's objection. The State then presented the testimony of M.D.'s mother, aunt, father, and father's girlfriend; Shelton; Frances Duncan, M.D.'s therapist; Jennifer Knisley, the CARE House forensic interviewer; Hall; and Detective

Spears.   Several exhibits were admitted into evidence, including photos of Kelly's home, text messages, pictures drawn by M.D. during therapy, and video-recordings of M.D.'s forensic interview, Kelly's interview with Detective Spears, and M.D.'s conversation with her father's girlfriend.   After deliberating, the trial court found Kelly guilty of Counts 14 (gross sexual imposition) and 16 (public indecency), but not guilty of Count 15 (gross sexual imposition).

{¶ 18} The jury trial on Counts 1-13 was scheduled for August 23, 2021, but that date was continued several times; the jury trial was ultimately rescheduled for August 2022.   In April 2022, Kelly moved to dismiss Counts 1-13 with prejudice on the ground that the statute of limitations on the rape and gross sexual imposition claims had expired before he was indicted.   After a hearing, the trial court overruled the motion.

{¶ 19} On August 8, 2022, Kelly filed a motion in limine seeking an order allowing the defense to cross-examine A.M. and L.M. on statements and medical information contained in their medical records.   The court overruled the motion, reasoning that the information was "immaterial and irrelevant to the issues at bar."

{¶ 20} On August 10, 2022, the State dismissed Counts 1, 3, and 7 of the indictment and asked the court to renumber the remaining counts related to A.M. and L.M. as Counts 1 through 10.   The trial court granted the motion.

{¶ 21} The matter proceeded to a jury trial on Counts 1-10 on August 16, 2023. A.M. and L.M. both testified for the State, as well as E.M., their brother; Tamara, their mother's friend; Brenda Miceli, a pediatric psychologist; Steve Ackerman, Kelly's friend; and Detective Spears.   The State also offered several exhibits.   Kelly did not offer any

evidence on his behalf.   The jury found Kelly guilty of all counts.

{¶ 22} Over several days in May 2022, August 2022, January 2023, and March 2023, the trial court conducted a hearing on the sexually violent predator specification for Count 14.   At the beginning of the sentencing hearing on April 11, 2023, the trial court found that the sexually violent predator specification applied.   The trial court also designated Kelly a sexually oriented offender and a Tier III sex offender.   It sentenced Kelly to an aggregate term of 15 years to life in prison, as detailed in the chart below.   It also ordered Kelly to pay restitution of $750 to L.M.

| Count | New # | Victim | Offense | Statute | Degree | Sentence |
|-------|-------|--------|---------|---------|--------|----------|
| 1 | N/A | A.M. | Rape (<13) | 2907.02(A)(1)(b) | F1 | **Dismissed** |
| 2 | 1 | A.M. | Attempted Rape (<13) | 2907.02(A)(1)(b) / 2923.02(A) | F2 | Mand 7 yrs |
| 3 | N/A | A.M. | Rape (<13) | 2907.02(A)(1)(b) | F1 | **Dismissed** |
| 4 | 2 | A.M. | Rape (<13) | 2907.02(A)(1)(b) | F1 | Mand 10 yrs |
| 5 | 3 | A.M. | Rape (<13) | 2907.02(A)(1)(b) | F1 | Mand 10 yrs |
| 6 | 4 | A.M. | Rape (force or threat of force) | 2907.02(A)(2) | F1 | Mand 10 yrs |
| 7 | N/A | L.M. | Rape (<13) | 2907.02(A)(1)(b) | F1 | **Dismissed** |
| 8 | 5 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 9 | 6 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 10 | 7 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 11 | 8 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 12 | 9 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 13 | 10 | L.M. | Gross Sexual Imposition (<13) | 2907.05(A)(4) | F3 | Mand 3 yrs |
| 14 | 14 | M.D. | Gross Sexual Imposition (<13) with SVP Spec. | 2907.05(A)(4) | F3 | Mand 5 to Life (Consec to Cts 1-10) |
| 15 | 15 | M.D. | Gross Sexual Imposition (<13) with SVP Spec. | 2907.05(A)(4) | F3 | **Acquitted** |
| 16 | 16 | M.D. | Public Indecency | 2907.09(A)(1) | M4 | 30 days in jail |

{¶ 23} Kelly appeals from his convictions, raising seven assignments of error.   His first, second, third, fourth, and fifth assignments of error concern the counts related to M.D., and his remaining two assignments of error concern the counts related to A.M. and

L.M.   We will address them in an order that facilitates our analysis.

## II. Denial of Crim.R. 29(A) Motion at Bench Trial

{¶ 24} We begin with Kelly's fourth assignment of error, which claims that the trial court erred in denying his Crim.R. 29(A) motion on Counts 14-15, the gross sexual imposition charges, during the bench trial.[1]   Kelly asserts that the State failed to present sufficient evidence of any type of touching with M.D.   Because the trial court acquitted Kelly of Count 15, only Count 14 is currently at issue.   According to the bill of particulars, Count 14 alleged that Kelly committed gross sexual imposition by causing M.D. to touch his penis with her hand between June 29, 2018 and July 7, 2018.

{¶ 25} Crim.R. 29(A) states that when a motion for acquittal is made after the evidence on either side is closed, a court shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction" for the charged offense.   "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence."   *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.   "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Finn*, 2d Dist. Montgomery No. 22914, 2009-Ohio-4949, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶ 26} "An appellate court's function when reviewing the sufficiency of the

---

[1] Kelly's Crim.R. 29(A) motion did not challenge the sufficiency of the State's evidence as to Count 16, public indecency, and he does not raise the sufficiency of the evidence for that charge on appeal. *See* Bench Tr. at 420.

evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 27} When reviewing the sufficiency of the evidence, "the court does not engage in a determination of the witnesses' credibility." *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Rather, the relevant inquiry is whether the evidence presented, if believed, was sufficient to support the conviction. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *Thompkins* at 390. The verdict will not be disturbed on appeal unless "the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jenks* at 273.

{¶ 28} Kelly was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4). This provision provides, in part, that "[n]o person shall have sexual contact with another * * * [or] cause another * * * to have sexual contact with the offender," if the other person is less than 13 years of age. R.C. 2907.05(A)(4); *State v. Gau*, 2d Dist. Montgomery No. 29786, 2023-Ohio-4205, ¶ 8. "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually

arousing or gratifying either person." R.C. 2907.01(B).

{¶ 29} "The purpose of sexually arousing or gratifying either person is an essential element of R.C. 2907.05(A)(4)." *State v. Curtiss*, 2d Dist. Montgomery No. 29006, 2022-Ohio-146, ¶ 146, quoting *In re Moore*, 10th Dist. Franklin No. 04AP-581, 2004-Ohio-6357, ¶ 11. However, the trier of fact may infer from the totality of the circumstances whether the purpose of the touching was for the defendant's sexual arousal or gratification. *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 43 (2d Dist.). Relevant considerations include the area(s) of the body being touched and the absence of evidence of accidental touching. *Curtiss* at ¶ 143.

{¶ 30} In this case, the State presented substantial evidence that Kelly caused four-year-old M.D. to have sexual contact with him. According to multiple witnesses, M.D. stayed overnight at Kelly's home during the weekend of June 29 to July 2, 2018. M.D.'s mother testified that on July 7, 2018, while M.D's two-year-old brother was stepping into a pull-up diaper, M.D. said that Kelly "showed her his wee wee and had her touch it." Bench Tr. at 51. Mother called her older sister (Aunt), with whom she was close, and went to her house, where Aunt spoke with M.D. Aunt testified that M.D. said that Kelly "pulled his thing out" and "asked her to touch it." Bench Tr. at 108. After M.D. spoke with her aunt, Mother talked to her again. M.D. repeated that Kelly "made her touch his wee wee." Bench Tr. at 55. M.D. told her mother that this had happened more than once. *Id.* M.D.'s father further testified that, shortly after M.D. disclosed Kelly's behavior to her mother, M.D. told him that "she was laying on [Kelly's] lap and he showed her his wee-wee, and he asked her to touch it, and she did." Bench Tr. at 311.

{¶ 31} Frances Duncan, M.D.'s therapist, testified about statements and drawings that M.D. had made during her weekly therapy sessions. Duncan stated that she talked with M.D. about "red flag touches," which are not okay. Bench Tr. at 154. Duncan explained that "red flag touches" occur when someone touches private parts of your body where you wear your swimsuit or your underwear. *Id.* M.D. told Duncan that Kelly had given her red flag touches. Bench Tr. at 155.

{¶ 32} M.D. told Duncan during a therapy session on October 5, 2018, that she had touched Kelly's penis. Duncan testified that she asked M.D. if Kelly had told her to touch his "wee wee," and M.D. said that he did. When Duncan asked if she did touch his "wee wee," M.D. "became very defensive and said, 'he told me to.' " Bench Tr. at 177. M.D. made similar statements at her October 10, 2018 appointment and at other subsequent appointments. *Id.* at 178-179, 192, 198. M.D. told Duncan that it had happened "a lot." *Id.* at 179. On December 12, 2018, M.D. again said that Kelly "made me touch it," referring to Kelly's penis. *Id.* at 198.

{¶ 33} M.D. drew several pictures of Kelly with an apparently erect penis and talked about moving "back and forth and back and forth." *See* State's Ex. 35-44. She frequently told Duncan that Kelly was "happy because of what he did," and she mentioned that when discussing some of the pictures she drew of Kelly. Bench Tr. at 180-183; State's Ex. 40-41.

{¶ 34} M.D. also expressed to several individuals that Kelly would be upset with her for reporting his behavior. Mother testified that M.D. was initially scared of Kelly being mad at her and that he would hurt her family; M.D. told her mother that Kelly "would

be very upset with her if she told." Bench Tr. at 69. During her interview at CARE House, M.D. also told Jennifer Knisley, the forensic interviewer, that Kelly told her not to tell.[2] Bench Tr. at 277-278; State's Ex. 32A. Discussing an August 2018 drawing during therapy, M.D. told Duncan that Kelly "was sad because I didn't keep it a secret." Bench Tr. at 162. Knisley explained at trial that instructions not to tell are significant, because they help distinguish whether the alleged behavior is benign, such as when the child accidentally sees something, "versus somebody intentionally doing something and then acknowledging that this is something they don't want to be talked about." Bench Tr. at 278.

{¶ 35} Construing the evidence in the light most favorable to the State, the evidence supported a conclusion that Kelly caused M.D. to touch his penis for the purpose of providing him sexual gratification. M.D. was four years old when the incident occurred, and she repeatedly stated that she touched Kelly's penis because he told her to. M.D. drew pictures that appeared to show Kelly with an erection, M.D. expressed to others that Kelly's sexual conduct with M.D. made him happy, and Kelly had instructed M.D. not to disclose what he had done. The State's evidence reasonably reflected that Kelly acted for the purpose of his own sexual gratification and that he understood the wrongfulness of his actions. Consequently, there was sufficient evidence to support Kelly's conviction for gross sexual imposition. The trial court did not err in denying his Crim.R. 29(A) motion.

---

[2] M.D. told Knisley during the CARE House interview that Kelly showed her his wee wee, but she did not disclose any touching. Bench Tr. at 278; see State's Ex. 32A. M.D. did allude to something else having occurred, but she did not want to discuss it during the interview. Id. at 284; State's Ex. 32A.

{¶ 36} Kelly's fourth assignment of error is overruled.

### III. Unavailability of M.D. as a Witness

{¶ 37} Kelly's first assignment of error claims that the trial court erred in declaring M.D. unavailable to testify at the bench trial pursuant to Evid.R. 807. He argues that three of the four requirements in Evid.R. 807(A) for allowing M.D.'s hearsay statements were not met.

{¶ 38} Under Evid.R. 801(C), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In general, hearsay is not admissible at trial. Evid.R. 802.

{¶ 39} "Evid.R. 807(A) allows out-of-court statements made by a child under the age of twelve to be admitted where those statements describe a sexual act performed by, with, or on the child." *In re A.E.*, 8th Dist. Cuyahoga No. 112615, 2023-Ohio-4217, ¶ 20. Four criteria must be met before such statements are admissible: (1) the trial court must find that the statement is trustworthy; (2) the child's testimony "is not reasonably obtainable by the proponent of the statement;" (3) independent proof of the act must exist; and (4) at least ten days prior to the trial or hearing, the proponent of the statement must provide written notice of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement. Evid.R. 807(A)(1)-(4).

{¶ 40} We review the trial court's determination that a child's statement is admissible under Evid.R.807 for an abuse of discretion. *In re S.H.W.*, 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, ¶ 31.

**{¶ 41}** On appeal, Kelly argues that the trustworthiness of M.D.'s statements, whether independent evidence of sexual abuse existed, and whether M.D.'s testimony was not reasonably obtainable are all at issue. However, on August 14, 2020, the trial court filed an amended agreed entry concerning the State's use of M.D.'s statements to various individuals pursuant to Evid.R. 807. The agreed entry provided, in relevant part:

> At the date of the hearing on the State's Motion, three witnesses were identified as witnesses to the child victim's statements which are offered as admissible pursuant to Evid.R. 807:
>
> 1) Mother C.K.
>
> 2) Aunt E.K.
>
> 3) Forensic Interviewer, Jennifer Knisley.
>
> At the hearing, the parties agreed that, in the event that Evid.R. 807(A)(2) is satisfied - meaning, the Court determines that the child's testimony is "not reasonably obtainable" as defined in subsection(B) – then *the parties agree and stipulate that the remaining requirements of Evid.R. 807(A)(1), (3), and (4) are sufficiently satisfied and the statements would be admissible.*
>
> This agreement does not limit any other applicable rules of evidence which may apply to the same statements, and reflects only the parties' agreement with regard to Evid.R. 807.

(Emphasis added.) Amended Joint/Agreed Entry (Aug. 14, 2020). After the prosecutor asked the trial court to declare M.D. unavailable under Evid.R. 807 at the bench trial,

defense counsel acknowledged that "the stipulation comes in after the court makes that determination." Bench Tr. at 28. Accordingly, Kelly has waived any argument that Evid.R. 807(A)(1), (3), and (4) were not satisfied, and we will focus on the trial court's determination that M.D.'s testimony was "not reasonably obtainable" at trial.

{¶ 42} Evid.R. 807(B) provides three circumstances in which a child's testimony may be "not reasonably obtainable by the proponent of the statement." Of relevance here, the trial court may find a child's testimony to be "not reasonably obtainable" when "[t]he child refuses to testify concerning the subject matter of the statement or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify." Evid.R. 807(B)(1).

{¶ 43} M.D. was seven years old when the bench trial occurred. From the beginning of her direct examination, M.D. was reluctant to answer the questions asked by the prosecutor. She initially stated that she did not know her name and denied that she could spell it or had to spell it in school. M.D. did provide her age when asked. When reminded that she needed to tell the truth, M.D. gave her first name, but said she did not know her last name or her father's last name, although she agreed they had the same last name. When provided her last name by the prosecutor, M.D. agreed that was it.

{¶ 44} M.D. then became a bit more forthcoming. She indicated that she was in first grade and had two teachers, and she provided their names. M.D. stated that she did not know where she went to school but provided the school's name upon further

questioning. M.D. told the court who she lived with and who her father lived with, although she said she did not know where her father lived.

{¶ 45} M.D. testified that she knew "Cheyenne" (Shelton) "because my mommy knows her." She acknowledged that Shelton used to babysit her. M.D. initially said that she did not know who Shelton lived with, but then said "sometimes kids, sometimes grownups." Bench Tr. at 14. M.D. said she did not remember if Shelton babysat her in a house or who else was there.

{¶ 46} M.D. indicated that she knew someone named Gary and that he lived with Shelton; M.D. said she did not know his daughter or girlfriend. M.D. indicated that she would "sometimes" stay overnight with Shelton, but she initially testified that no one else would be there, including Kelly. When asked directly if Kelly would be there sometimes, she responded, "Sometimes." Bench Tr. at 15. M.D. also said her cousin and little brother would sometimes stay there.

{¶ 47} M.D. repeatedly denied that she had talked with her mother about something that had happened with Kelly. When asked if she did not want to talk about it or did not remember, M.D. said she did not remember. M.D. repeatedly denied talking to people at CARE House, to "Ms. Frances" (her therapist, Frances Duncan), or to her father about it. M.D. testified that she did not know who Duncan was but indicated that she colored and played with her. M.D. denied remembering anything that happened on the couch at Kelly's house, except that the dog chewed holes in the couch. She testified that she did not see Kelly in the courtroom, and she said that she did not know several others. When asked if there was "anything you can remember that happened that you

think you should tell the Court about today," M.D. responded, "no" and that she did not remember.

{¶ 48} After a brief sidebar discussion, M.D.'s mother was brought into the courtroom to encourage M.D. to testify. After speaking briefly with M.D., her mother said that M.D. did not want to talk. The prosecutor asked if there was anything they could do to make the experience less scary for her. M.D. replied, "No." M.D.'s mother pointed out to M.D. that she only needed to talk to the judge. When asked if she remembered the judge, M.D. said no, even after her mother reminded her that she had seen him five times.

{¶ 49} After M.D.'s mother again left the courtroom, M.D. reiterated that she did not want to talk to the prosecutor, that she did not remember the things they had discussed before, and that there was nothing the prosecutor could ask to help her testify. After further attempts to elicit testimony from M.D., the prosecutor asked the trial court to find that M.D.'s testimony was not reasonably obtainable and that she was unavailable under Evid.R. 807.

{¶ 50} Defense counsel disagreed that M.D.'s testimony was not obtainable. They argued that M.D. often replied, "I don't know," rather than "I don't remember." Defense counsel further noted that M.D. indicated that she remembered Shelton and the couch, and thus questioned whether she had an actual lack of memory. They further noted that Duncan would be able to testify to M.D.'s statements regarding the alleged crimes, as M.D.'s statements to her therapist were made for the purposes of medical diagnosis. Counsel objected, however, to M.D.'s statements being admitted through

other individuals.

**{¶ 51}** The State argued that "I don't know" and "I don't remember" were "functionally equivalent" for a seven-year-old and that M.D.'s "guarding technique is to shut down, avoid, 'I don't remember', run around the room. Any combination of avoidance techniques is consistent with, I think, what we've seen here today * * * when she encounters something scary or hard to talk about * * *." Bench Tr. at 29. The prosecutor asserted that, whether it was actual lack of memory or a persistent refusal to discuss what happened, M.D. would not be able to testify.

**{¶ 52}** The court ruled that Evid.R. 807(B) had been met, and it declared M.D. unavailable.

**{¶ 53}** We find no abuse of discretion in the trial court's ruling. M.D. was reluctant to answer any of the prosecutor's questions, including those that were clearly within her knowledge and memory. While M.D. did answer several questions regarding her schooling and family, she often did so only after first expressing that she did not know. As the topic turned to the people and circumstances giving rise to the charges, M.D. became increasingly reluctant to provide details and expressed a lack of memory. Even after her mother came into the courtroom to encourage her, M.D. indicated that there was nothing the prosecutor could do to make her less scared and willing to testify. Under these circumstances, the trial court reasonably determined that M.D.'s testimony was not reasonably obtainable.

**{¶ 54}** Kelly's first assignment of error is overruled.

### IV. Refreshed Recollection

{¶ 55} Kelly's second assignment of error claims that the trial court erred in allowing lay witnesses to review a police report to refresh their recollections during the bench trial. He argues that the report provided "the impression of the detective, not actual statements made or written by the testifying witnesses."

{¶ 56} When a witness lacks a present recollection of relevant events, a party may use a writing or recording to refresh the witness's recollection. *See* Evid.R. 612; *State v. Ford,* 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 231 ("The state could have refreshed [witness's] recollection under Evid.R. 612 by showing her the videotaped interview outside the jury's presence."). To accomplish this, "the witness looks at the memorandum to refresh his [or her] memory of the events, but then proceeds to testify upon the basis of his [or her] present independent knowledge." *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972); *Ford* at ¶ 230. "The testimony of the witness whose recollection has been refreshed is the evidence, not the contents of the writing." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57. The writing or recording used to refresh a witness's recollection is merely "a memory jogging device." *State v. Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 28.

{¶ 57} Evid.R. 612 does not discuss what types of writings are permitted to refresh a witness's recollection. Several Ohio appellate districts have expressly held that Evid.R. 612 does not require the witness to have prepared the writing or recording used to refresh the witness's recollection. *See, e.g., State v. O'Keefe*, 11th Dist. Ashtabula No. 2002-A-0015, 2004-Ohio-5300, ¶ 74, citing Weissenberger, *Ohio Evidence*, Section 612.3, 312 (2004); *State v. Jewett*, 10th Dist. Franklin No. 11AP-1028, 2013-Ohio-1246,

¶ 65; *State v. Rector*, 7th Dist. Carroll No. 01 AP 758, 2002-Ohio-7442, ¶ 39 ("There is no requirement in the rule that the witness must have prepared the writing being used to refresh that recollection.").

{¶ 58} In *Jewett*, the Tenth District permitted the use of a detective's summary of a witness's interview to refresh the witness's recollection.  In that case, a homicide detective interviewed a firefighter/paramedic who had provided medical treatment to the victim outside the victim's residence during the afternoon and then returned to the residence that evening when the home was on fire with the victim deceased inside.  The recording of the interview was accidentally destroyed prior to trial, but the detective had made a written summary of the interview.  During his trial testimony, the paramedic indicated that a review of the summary would refresh his recollection.  Noting that the "writing" discussed in Evid.R. 612 did not have to be an original document or recording, nor did it have to be previously adopted by the testifying witness, the Tenth District concluded that the trial court did not err in allowing the State to use the detective's summary to refresh the paramedic's memory.   *Jewett* at ¶ 65; *see also State v. Osborne*, 5th Dist. Knox No. 2005-CA-09, 2005-Ohio-6497, ¶ 19 (detectives could utilize the police investigation report written by another detective to refresh their recollections of the events pursuant to Evid. R. 612); *Turner* at ¶ 28-29 (no error in using 911 call log to refresh witness's memory about when she reported the incident).   We find *Jewett* instructive.

{¶ 59} In this case, the State used Detective Spears's "Detective Investigatory Product" (State's Ex. 46) and an Incident Detailed Report (State's Ex. 47) to refresh the recollections of M.D.'s mother and Tracy Hall, over defense counsel's objections.   The

State first asked M.D.'s mother on redirect examination if she had ever told the police that M.D. said that Kelly's conduct happened more than once. Mother responded that she did not remember telling the initial responding officer, and she said that looking at a copy of his report would refresh her recollection. The State then asked Mother to look at the narrative summary that Officer Adam Sharp had prepared at 5:33 p.m. on July 7, 2018 (State's Ex. 46, p. 4). After reading it, M.D.'s mother testified that her memory had been refreshed. She then stated that M.D. had told her it happened more than once and that she (Mother) had told the officer. Bench Tr. at 92-93.

{¶ 60} Later in the redirect examination, M.D.'s mother indicated that she did not remember identifying who had committed the sexual abuse during her 911 call. She testified, "No, I think I just said that my four-year-old was sexually abused * * * and I needed to speak with an officer." Bench Tr. at 97. The prosecutor asked if reviewing the Incident Detailed Report (State's Ex. 47) would help refresh her recollection, and Mother responded affirmatively. Bench Tr. at 97. Upon looking at the document, Mother stated, "I don't really know how to read this." Id. at 98. After the prosecutor pointed out the narrative portion, Mother confirmed that she never gave Kelly's name to the dispatcher. The prosecutor again referred Mother to Officer Sharp's report to refresh her memory as to whether she told the officer. Mother again stated that it had refreshed her recollection and testified that she told Officer Sharp that the perpetrator was Kelly, Shelton's foster father.

{¶ 61} During Hall's direct examination, Hall testified that she had confronted Kelly about whether he displayed his penis to M.D., and Kelly admitted that he did; Kelly

explained to Hall that M.D. was going to tell Shelton.   Bench Tr. at 342.   Hall stated that either Kelly then walked out of the room or she did.   When questioned if she had confronted Kelly about his explanation, Hall indicated that she did not remember any more of the conversation.   The prosecutor asked if reviewing Detective Spears's report would refresh her recollection, and Hall responded, "Possibly.   Yes."   After the trial court overruled defense counsel's objection, the prosecutor showed Hall the relevant paragraph in Spear's investigatory report.   After reviewing the paragraph, Hall testified that the conversation went "[j]ust like what I said. * * * Either he walked out or I did." Bench Tr. at 345.

{¶ 62} We find no error in the use of the police reports to refresh the witnesses' recollections.   Although neither witness authored the report that she reviewed, the reports documented the witnesses' prior statements to police officers.   Both witnesses testified that reviewing the exhibit(s) would assist them in refreshing their recollections, and after reviewing the exhibit silently, the witnesses testified from their refreshed memories.   Defense counsel had access to both exhibits and could have cross-examined the witnesses about them.

{¶ 63} Kelly's second assignment of error is overruled.


## V. Motion in Limine: Prior Bad Act

{¶ 64} In his third assignment of error, Kelly claims that the trial court erred in overruling his motion in limine during the bench trial.

{¶ 65} In March 2020, defense counsel requested a motion in limine prohibiting the

State from introducing any evidence of Kelly's prior bad acts. Specifically, he argued that evidence regarding the allegations in Counts 1-13, which concerned A.M. and L.M., was inadmissible under Evid.R. 401, 402, 403, and 404. He asked the court to preclude the State from introducing evidence related to those charges, including all information, testimony, and evidence related to those allegations, Kelly's police interview in which those acts were discussed, and questions asked of Kelly about prior acts for which he had not been convicted or tried.

{¶ 66} On October 27, 2020, Kelly filed an amended motion in limine. This motion added the following argument: "Additionally, the Defendant made statements to Detective Spears during his recorded interview on this incident which did not lead to any charges. Specifically, the Defendant states that the alleged victim climbed on his shoulders and put her vagina in his face. The Defendant denied touching the alleged victim and this statement did not result in any charges and is therefore irrelevant and inadmissible under Evidence Rules 401 and 402."

{¶ 67} At the beginning of the bench trial, defense counsel reminded the trial court that he had filed a motion in limine and that "I think at the final pretrial, [the prosecutor] and I agreed on the record that everything that was put in there that the State agrees with me, barring any – us opening the door, of course." Bench Tr. at 5. (The record does not contain a transcript of this final pretrial conference.)

{¶ 68} During Detective Spears testimony on the second day of the bench trial, however, the State played the portions of Kelly's police interview in which he had said that M.D. climbed on his shoulders and put her vagina in his face. *See* State's Ex. 45A.

Defense counsel objected and requested a mistrial, stating that this evidence was contrary to the parties' stipulation. The State initially responded that it had agreed only not to mention other victims. However, the prosecutor later apologized, saying that she had "missed that specific statement in [defense counsel's] motion" and that she had not intended to violate the terms of the motion in limine. The State argued, however, that Kelly's response to the allegations was relevant, was part of a course of events, and did not constitute a prior bad act. Defense counsel countered that this incident was a "separate act altogether" and was "completely irrelevant [and] extremely prejudicial."

{¶ 69} The court allowed the interview to be played. It reasoned:

Well, whether it's prior bad act. That's really the question. You're saying it's a prior bad act. It's [a] separate and distinct act. The State asserts as [sic] part of a continuous series of acts, continuous transaction and occurrence. And if the evidence would reveal over – well, once we hear everything, that your assertion, your version of this is correct, then I will disregard it, and not consider it as evidence in this case.

* * *

The rules * * * on a motion in limine is it's a tentative ruling by the Court that's made outside the context of hearing the evidence in its full context. I haven't heard the evidence in its full context. I could change my ruling on the motion in limine. A court can do that. It's a tentative initial ruling by the Court to give some guidance to the parties in their execution of the trial of a case. * * * [The motion in limine] was agreed, but the Court

still has to adopt it. And the Court, as in any motion in limine, once hearing the evidence in the full context, can decide that the evidence comes in, even though it had maybe initially ruled that it was not. Just like in – if it was the other way around, you know. If I'd said it comes in, and then I hear the full context, defense could renew the motion in limine and ask the Court not to consider it. And I could change. It's the nature of motions in limine. We don't know, before the trial sometimes, what all the evidence is and how it relates.

So you've noted – you've made your exception.

Bench Tr. at 373-375.

{¶ 70} "[I]n reviewing a bench trial, an appellate court presumes that a trial court considered nothing but relevant and competent evidence in reaching its verdict. The presumption may be overcome only by an affirmative showing to the contrary by the appellant." *State v. Wiles*, 59 Ohio St.3d 71, 86, 571 N.E.2d 97 (1991), citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987); *State v. Chirco*, 2d Dist. Montgomery No. 29399, 2023-Ohio-22, ¶ 17. Even if we were to conclude that the disputed portion of Kelly's interview should not have been admitted, we must presume that the trial court considered only the evidence relevant to the indicted charges, and the record does not suggest that the court did otherwise. *See State v. King*, 2d Dist. Champaign No. 2021-CA-18, 2021-Ohio-4228, ¶ 23. To the contrary, the trial court expressly stated that it would disregard Kelly's disputed statements if it determined that they discussed prior bad acts.

{¶ 71} Kelly's third assignment of error is overruled.

## VI. Ineffective Assistance of Counsel

{¶ 72} Kelly's fifth assignment of error claims that his trial counsel rendered ineffective assistance when he withdrew Kelly's motion to suppress statements that he made to the police. He indicates that those statements were subsequently used against him at the bench trial.

{¶ 73} We review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which was adopted by the Ohio Supreme Court in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To prevail on an ineffective-assistance claim, a defendant must show that trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. Failure to make a showing of either deficient performance or prejudice defeats an ineffective-assistance claim. *Strickland* at 697.

{¶ 74} To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 29. To establish

prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus.

**{¶ 75}** The withdrawal of a motion to suppress does not constitute per se ineffective assistance of counsel. *State v. Caldwell*, 2d Dist. Greene No. 2013-CA-76, 2015-Ohio-2551, ¶ 43. "Instead, the decision to withdraw a motion to suppress 'constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful.' " (Citations omitted.) *Id.* at ¶ 44.

**{¶ 76}** In this case, defense counsel sought to have Kelly's statements to law enforcement officers suppressed on the ground that they were made in violation of his *Miranda* rights. Counsel withdrew Kelly's motion to suppress prior to any hearing on the motion.

**{¶ 77}** During the bench trial, Detective Spears indicated that, on July 31, 2018, he went to Kelly's home and spoke with Kelly's girlfriend and daughter. While taking photos with their consent, Spears found Kelly on his bed. Kelly gave consent to continue taking photos. The two also discussed scheduling an interview at a later date, and Kelly agreed to come. Spears testified that Kelly came to the police station on his own, either by driving himself or getting a ride from someone; he "was not brought in by police in any way." Bench Tr. at 354. Spears described how Kelly would have gotten to the interview room, which was approximately 10 feet by 7 feet and unlocked. Detective Spears testified that the interview began at 1:49 p.m. and lasted approximately an hour. He

indicated that Kelly was informed of his *Miranda* rights, waived them, and agreed to speak with him. Bench Tr. at 361.

{¶ 78} A video-recording of Detective Spears's interview with Kelly was admitted at the bench trial as Court's Exhibit II. At the beginning of the interview, the detective told Kelly that he was not under arrest and that he could leave at any time; Spears pointed out that the door to the interview room, which another detective (Detective Alley) had closed, was unlocked and that Kelly could walk out. Kelly told Detective Spears that he had previously been arrested and notified of his *Miranda* rights. The detective reviewed Kelly's *Miranda* rights with him, and Kelly expressed that he understood them and was willing to talk to the officer. Kelly initialed the waiver of rights form next to each right and signed at the bottom. On this record, there is no evidence that the motion to suppress Kelly's statements would have succeeded. Accordingly, Kelly has not demonstrated that his trial counsel rendered ineffective assistance by withdrawing the motion to suppress.

{¶ 79} Kelly's fifth assignment of error is overruled.

### VII. Motion to Dismiss Counts 1-13

{¶ 80} In his seventh assignment of error, Kelly claims that the trial court erred in failing to dismiss Counts 1 through 13 on statute of limitations grounds.

{¶ 81} The State offered three exhibits in response to the motion to dismiss, including the August 7, 1993 police report and A.M.'s witness statement. The State also asked the trial court to consider the testimony of several witnesses from the hearings on the sexually violent predator specification: A.M., L.M., Tamara (their mother's friend whom they considered an aunt), and Chief Richardson of the Moraine Police Department;

defense counsel had no objection.    See Motion to Dismiss Tr., p. 272-273.

{¶ 82} The trial court concluded that the statute of limitations for the charged offenses began when A.M. and L.M. each turned 18 years old, and that Kelly had been indicted within the limitations periods.    As to A.M., the trial court stated that her partial disclosure in 1993 did not trigger the statute of limitations for rape because the corpus delicti of rape was not discovered.    The trial court stated that, in reaching its decision, it considered the three exhibits and testimony of witnesses from the May 20, 2022 sexually violent predator hearing; A.M. testified at the May 24, 2022 sexually violent predator hearing, and it is unclear whether the trial court considered her testimony.

{¶ 83} We generally review a trial court's decision on a motion to dismiss an indictment de novo. *State v. Hagen*, 2d Dist. Champaign No. 2018-CA-2, 2018-Ohio-4045, ¶ 21; *State v. Milton*, 2d Dist. Montgomery No. 27819, 2018-Ohio-4999, ¶ 11. However, we must afford great deference to the trial court's factual findings.    *See State v. Hawkins*, 2d Dist. Montgomery No. 27019, 2018-Ohio-867, ¶ 37.    "When reviewing a trial court's decision on a motion to dismiss (or any other motion), we are limited to the evidence that was before the trial court for that motion.    *Id.* at ¶ 20.

{¶ 84} "Statutes of limitations provide the ultimate time limit within which the government must prosecute a defendant[.]"    *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11.    When the offenses against A.M. and L.M. occurred, R.C. 2901.13(A)(1) provided a six-year statute of limitations for all felonies other than aggravated murder or murder.    Effective March 9, 1999, the statute of limitations for rape, attempted rape, and gross sexual imposition was extended to 20 years after the offense

was committed. R.C. 2901.13(A)(3); 1998 H.B. 49. The revised statute included language that the revision applied not only to offenses occurring after the effective date, but also to offenses committed prior to the effective date if the statute of limitations had not yet expired. 1998 H.B. 49, Section 3. In 2015, the statute of limitations for rape was extended to 25 years. R.C. 2901.13(A)(4); 2015 Sub.H.B. 6. This amendment also applied to offenses "committed prior to the effective date of the amendments if prosecution for that violation was not barred under this section as it existed on the day prior to the effective date of the amendments." R.C. 2901.13(L).

{¶ 85} "Generally, statutes of limitations begin to run when the crime is complete." *State v. Swartz*, 88 Ohio St.3d 131, 133, 723 N.E.2d 1084 (2000), citing *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970); *Milton* at ¶ 14. However, the limitations period is tolled "during any time when the corpus delicti remains undiscovered." Former R.C. 2901.13(F), now R.C. 2901.13(G). "The corpus delicti of a crime is essentially the fact of the crime itself." *State v. Ashe*, 2d Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 9, quoting *State v. Barker*, 10th Dist. Franklin No. 03AP-43, 2003-Ohio-5346, ¶ 4. The "corpus delicti" has two elements: (1) the act itself, and (2) the criminal agency of the act. *State v. Hensley*, 59 Ohio St.3d 136, 138, 571 N.E.2d 711 (1991); *Milton*, 2d Dist. Montgomery No. 27819, 2018-Ohio-4999, at ¶ 11. To establish the corpus delicti, only some evidence that a crime was, in fact, committed is required; there is no need for evidence showing that the accused committed the crime. *State v. Harris*, 2d Dist. Montgomery No. 29780, 2024-Ohio-99, ¶ 38.

{¶ 86} In 1991, the Ohio Supreme Court addressed when the corpus delicti for

child sexual assault is discovered, recognizing that the sexual abuse of children involved special considerations. *Hensley* at 138-139. It explained:

> * * * It is common knowledge in child sex abuse cases that the victims often internalize the abuse, and in some instances blame themselves, or feel somehow that they have done something wrong. Moreover, the mental and emotional anguish that the victims suffer frequently inhibits their ability to speak freely of the episodes of abuse. For these reasons, we reject the court of appeals' holding that because the children in the present case understood the wrongness of appellee's acts, the corpus delicti of the crime was discovered by them. While the record in this case suggests that the two children comprehended the inappropriateness of appellee's actions, it would pervert justice to impose on those whom the Criminal Code seeks to protect the responsibility to know the exact criminal nature of such conduct. In other words, even though a child of tender years may know that an act committed against him or her is wrong or even criminal, we are unwilling to impose the burden to contact the authorities on an already traumatized and susceptible child.

*Id.*

**{¶ 87}** The Court sought to "strike a proper balance between the need to place some restriction on the time period within which a criminal case may be brought, and the need to ensure that those who abuse children do not escape criminal responsibility for their actions." *Id.* at 139. It held that, "[f]or purposes of R.C. 2901.13(F), the corpus

delicti of crimes involving child abuse or neglect is discovered when a responsible adult, as listed in R.C. 2151.421, has knowledge of both the act and the criminal nature of the act." *Id.* at syllabus. Disclosure to a parent was expressly excluded from triggering the statute of limitations.

{¶ 88} We and other appellate districts subsequently held that the tolling in *Hensley* terminated when the child reached the age of majority. *E.g., State v. Wooldridge*, 2d Dist. Montgomery No. 17708, 1999 WL 812363 (Oct. 8, 1999).

{¶ 89} In August 2006, the Ohio legislature added a provision to R.C. 2901.13 addressing when the statute of limitations is triggered for offenses involving child abuse or neglect. Former R.C. 2901.13(I); 2006 Am.Sub.S.B.17. The new provision stated that the limitations period for criminal offenses involving child victims did not begin to run until either (1) the victim reaches the age of majority, or (2) a public children services agency or a municipal or county peace officer that is not the child's parent or guardian has been notified "that *abuse* or neglect *is known, suspected, or believed to have occurred.*" (Emphasis added.) Former R.C. 2901.13(I), now R.C. 2901.13(J).

{¶ 90} Statutes are presumed to be prospective in operation unless expressly made retrospective. R.C. 1.48; *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, ¶ 9. Unlike other amendments to R.C. 2901.13, the Ohio legislature did not specify that former R.C. 2901.13(I), now R.C. 2901.13(J), was to apply retroactively. We therefore presume that the August 2006 amendment applies only to cases in which, when the amendment became effective, the statute of limitations had not yet begun to run. In this case, both A.M. and L.M. turned 18 prior to the passage of former R.C. 2901.13(I)

and, thus, the limitations period for bringing a prosecution had already started. Accordingly, we conclude that current R.C. 2901.13(J) does not apply to this case, and we will focus only on when the corpus delicti was discovered under *Hensley* for purposes of R.C. 2901.13(G).

### A. Statute of Limitations for L.M.

{¶ 91} Turning to the case before us, we begin with the charges involving L.M., who was born in October 1981. The indictment alleged that the offenses occurred between January 1, 1987, and August 7, 1993, when L.M. was between five and eleven years old. L.M. did not report the sexual abuse while she was a minor. The August 7, 1993 police report regarding A.M. (State's Exhibit B) stated that the girls' mother questioned L.M. about Kelly's conduct, but L.M. "repeatedly denied that any offenses had been committed against her." The report further stated that neither A.M. nor the girls' mother believed L.M.'s denials and that Officer Chamber also "suspect[ed] that it is very likely that suspect has violated L.M. in a similar fashion as [A.M.]," but there was no evidence at that time that a crime against L.M. had been committed. Therefore, the statute of limitations for her offenses began to run when she turned 18 in October 1999.

{¶ 92} At that point, the statute of limitations for both rape and gross sexual imposition was 20 years and would have expired in October 2019. Because L.M. was a minor when the amendments took effect, the increased limitations period applied. *See State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 13; *State v. Jensen*, 6th Dist. Lucas No. L-20-1042, 2021-Ohio-3505, ¶13-14. Before the new limitations period expired, the statute of limitations for rape was extended to 25 years, thus permitting

a rape charge to be brought until October 2024. As summarized in the chart below, Kelly was indicted on rape and gross sexual imposition charges involving L.M. on April 11, 2019, within the limitation periods for both offenses. Accordingly, the trial court properly denied the motion to dismiss Counts 7 to 13 of the indictment.

| DATE | EVENT |
| --- | --- |
| October 1981 | L.M.'s birthdate |
| March 1999 | Statute of limitations for rape/GSI extended to 20 years |
| October 1999 | L.M. turned 18 years old; limitations period began |
| August 2015 | Statute of limitations for rape extended to 25 years |
| April 2019 | *Kelly indicted on rape/GSI charges* |
| October 2019 | Statute of limitations for GSI expired |
| October 2024 | Statute of limitations for rape expired |

### B. Statute of Limitations for A.M.

{¶ 93} A.M. was born in May 1978 and, as with the charges concerning L.M., the charged offenses concerning A.M. were alleged to have occurred between January 1, 1987 and August 7, 1993, when she was between 8 and 15 years old. On August 7, 1993, A.M. reported to the Moraine police that Kelly had repeatedly touched her "privates," touched her buttocks, masturbated in front of her while touching her privates, and licked her stomach. State's Exhibit A. An officer prepared an offense case report for sexual imposition. State's Exhibit B. A.M. and her mother had another visit to the police department on September 15, 1993, *see id.*, but it appears that little to no investigation followed. When A.M. made these reports, the statute of limitations for rape and gross sexual imposition was six years.

{¶ 94} The parties appear to agree that the limitations period for gross sexual imposition began to run with A.M.'s August 1993 disclosure to the Moraine police. The

statute of limitations was extended to 20 years in March 1999, prior to the expiration of those six years, and therefore the extension applied to A.M.'s allegations. However, the statute of limitations expired in August 2013, prior to Kelly's indictment. No gross sexual imposition charges related to A.M. were included in the indictment.

{¶ 95} The parties dispute whether the limitations period for rape also began with her 1993 disclosure to the Moraine police. The State asserts that because A.M., while a minor, never disclosed that Kelly had perpetrated rape offenses, the statute of limitations for rape did not begin to run until she reached age 18 in May 1996. If the State is correct, the statute of limitations expired in May 2021, two years after Kelly was indicted. On the other hand, if the limitations period began to run on or before August 1993, it expired several years before the indictment.

{¶ 96} According to the State's exhibits, A.M.'s August 7, 1993 disclosure of sexual abuse to the Moraine police was limited to conduct that constituted gross sexual imposition or sexual imposition. Neither A.M.'s witness statement nor the available police reports included disclosures of sexual conduct, as defined in R.C. 2907.01(A), which is required for rape. Chief Richardson testified that both Officer Chamber, who took the August 7, 1993 report, and Detective Hicks, who did an initial follow-up, were retired. Richardson contacted them, but neither recalled the case.

{¶ 97} A.M. provided additional information at the May 24, 2022 sexually violent predator hearing. She testified that the abuse had occurred at her Moraine residence, where she lived from first grade until 1991. She indicated that she told her parents and Tamara about the abuse on the morning after taking a sex education class and realizing

what Kelly had been doing to her. She testified: "I came running down the stairs, and I just – the next morning – because he came in my room that night and jacked off, and I came running down the stairs that morning and said, I have had enough. I've taken enough. I can take no more. I'm not going to take no more. I know what he's doing to me. He is having sex with me. He is raping me. He is molesting me, and this isn't fair. And why is he doing this to me? I'm just a little kid." SVP Tr. at 220-221. A.M. stated that Kelly was kicked out of the house that day, and her mother took her to the police department. *Id.* at 221-222.

{¶ 98} Tamara, who testified at the May 20, 2022 sexually violent predator hearing, testified that she was present when A.M. came downstairs crying and made disclosures about Kelly and that Kelly was evicted from the family's residence that day. *Id.* at 31-34. Tamara indicated that A.M. was 12 or 13 when she initially made the disclosures. *Id.* at 56. A.M.'s friend, J.C., testified that after Kelly touched her in early August 1993, she talked to A.M. at the request of A.M.'s brother, E.M. *Id.* at 76. J.C. stated that she discussed filing a police report with A.M. and "basically begged her not to let that go * * * because it was so horrific." *Id.* at 76-77.

{¶ 99} A.M. testified that she went to the police a total of four times. SVP Tr. at 235-237. She said that the first time was with her mother in 1991 and the second and third times were with J.C. She testified, somewhat inconsistently, that the first three visits to the police department occurred in the same year, *id.* at 237, although State's Exhibit B showed that she went to the Moraine police station twice in 1993. (The August 7, 1993 police report showed that A.M. no longer lived at the Moraine residence when that report

was made.) The last time, A.M. was older and she went because she was "tired of [Kelly] taunting [her] at the ballpark, and something needed to be done." *Id.*

{¶ 100} A.M. testified that she wrote a report each time she went to the police station. SVP Tr. at 238. She recalled that the 1991 report was given to Detective Mike Hanks. *Id.* at 239-240. When asked about the interview on cross-examination, A.M. stated that she did not tell the police everything that Kelly had been doing to her, because Hanks "cut [her] off." *Id.* at 243. She explained that the detective said to "let [her] mother speak" and that her mother needed to complete the report. *Id.* at 244. A.M. also acknowledged that she did not include all of Kelly's alleged conduct in her August 7, 1993 written statement to the police. She explained that she was given only a limited time to complete her written statement. *Id.* at 224-225.

{¶ 101} However, A.M. testified that she gave written statements to the Moraine police that alleged rape. She stated:

Q All right. So you're saying you wrote more than one statement for the police?

A Oh, yeah.

Q And in any of them, did you mention any of the rapes that occurred, fingers inside your body, or penises trying to go inside your body?

A Yes.

Q And you gave that to the police?

A Yes, I did.

Q Do you remember what year you did that?

A No, sir, I don't.   I mean, I know – I mean, I have it written down at home.   I wasn't –

Q Okay.   Was it – when you wrote a statement and you mentioned the rapes, was that one of the times that you were down there with [J.C.] or one of the other times?

A I know I told [J.C.].   So I mentioned it that time, but I don't recall exactly when.

*Id.* at 238.   A.M. stated that the Moraine police had collected three boxes of evidence regarding the allegations against Kelly, including panties provided by A.M. and L.M. *Id.* at 235.   That evidence and A.M.'s additional written statements were unaccounted for.

{¶ 102} On appeal, Kelly points to a portion of A.M.'s testimony during the subsequent jury trial.   At that time, A.M. similarly testified that she went to the Moraine police department on four occasions and wrote statements each time.   Jury Tr. at 235-236.   She indicated that the first report was made in 1991, when Kelly was kicked out of the house.   A.M. identified State's Ex. 12 as her August 7, 1993 written statement and said that she was given five minutes to write and "that's all I could get written out."   *Id.* at 242-243.   A.M. testified that she told the officers who took the reports about oral sex and vaginal sex, but she did not write about the incidents because she thought the officer had recorded the information in his notes.   *Id.* at 243, 261-263.   A.M.'s testimony indicated that she disclosed rape to police officers by 1993, if not before.   However, this trial testimony was not before the trial court when it ruled on Kelly's April 20, 2022 motion to

dismiss Counts 1-13, and we cannot consider it in reviewing the trial court's decision.[3]

{¶ 103} In denying the motion to dismiss the rape counts concerning A.M., the trial court found that, until the 2018 investigation, A.M. had never disclosed to a mandated reporter that Kelly had perpetrated numerous rape offenses against her during the indicted timeframe.   However, the trial court did not account for A.M.'s testimony at the sexually violent predator specification hearing.   Although the evidence was inconsistent about when A.M. said what and who accompanied her, A.M. testified unequivocally that she told Moraine police officers about the sexual conduct, likely around the time she told J.C., if not before.   A.M. was also clear that she had made multiple written reports and that State's Exhibits A and B did not reflect all of her disclosures about Kelly's conduct.

{¶ 104} It was the State's burden to demonstrate that it prosecuted the charged offenses within the appropriate statute of limitations.   *Milton*, 2d Dist. Montgomery No. 27819, 2018-Ohio-4999, at ¶ 22, citing *State v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A.*, 85 Ohio St.3d 582, 587, 709 N.E.2d 1192 (1999).   Based on the evidence before the trial court when Kelly's motion was decided, the State did not meet this burden as to the charges related to A.M.   A.M.'s own testimony indicated that she disclosed to the Moraine police that Kelly had raped her.   Although she did not provide an exact date, her testimony suggested that it occurred in 1993, when J.C. also went to the Moraine police to disclose sexual abuse by Kelly.   Based on A.M.'s testimony, the statute of limitations for rape began to run with her August 1993 disclosure, if not before.

---

[3] After the jury trial but before sentencing, Kelly filed a pro se motion to dismiss Counts 1-10 as outside the statute of limitations.   The trial court dismissed the motion the next day, but the reasons were stated at a scheduling conference, which was not transcribed. Kelly's assignment of error does not appear to address this motion.

{¶ 105} As summarized in the table, because the statute of limitations for rape began to run on or about August 1993, the statute of limitations expired several years before the 16-count indictment was filed and served.

| DATE | EVENT |
|---|---|
| May 1978 | A.M. birthdate |
| August 1993 | A.M. reports sex abuse to the Moraine police; statute of limitations period began for gross sexual imposition and rape |
| May 1996 | A.M. turned 18 years old |
| March 1999 | Statute of limitations for rape/GSI extended to 20 years |
| August 2013 | Statute of limitations for GSI and rape expired |
| April 2019 | *Kelly indicted on rape charges* |

Accordingly, the trial court erred in denying Kelly's motion to dismiss Counts 1 through 6.

{¶ 106} Kelly's seventh assignment of error is overruled in part and sustained in part.

### VIII. Motion in Limine: Medical Information and Prior Statements

{¶ 107} In his sixth assignment of error, Kelly claims that the trial court erred in denying his motion in limine seeking to use prior statements and medical information from A.M. and L.M.'s medical records.

{¶ 108} A motion in limine is a pretrial request that certain purportedly inadmissible evidence not be referred to or offered at trial. *State v. Jones*, 2d Dist. Montgomery No. 28977, 2021-Ohio-3050, ¶ 56, citing Black's Law Dictionary (11th Ed. 2019). "Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard." *Id.*, quoting Black's Law Dictionary (11th Ed. 2019).

{¶ 109} The granting or denial of a motion in limine does not determine the

admissibility of the questioned evidence. *Id.* at ¶ 57. Instead, "it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible." (Citations omitted.) *State v. Grubb*, 28 Ohio St.3d 199, 201, 503 N.E.2d 142 (1986). Hence, a decision on a motion in limine is a "tentative, interlocutory, precautionary ruling by the trial court" reflecting its anticipatory treatment of the evidentiary issue. *Id.* at 201-202; *State v. Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, ¶ 28.

{¶ 110} Because the ruling on a motion in limine is not final, "[a]n appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." *State v. Leslie*, 14 Ohio App.3d 343, 344, 471 N.E.2d 503 (2d Dist.1984). "Failure to object to or proffer evidence at trial based on the disposition made in a preliminary motion in limine constitutes a waiver of any challenge." *Tyra* at ¶ 28.

{¶ 111} On August 8, 2022, Kelly filed a motion in limine seeking an order allowing the defense to cross-examine A.M. and L.M. on statements and medical information contained in their medical records. Defense counsel highlighted portions of their medical histories addressing their mental health histories and prescription medications, as well as information regarding their parents' substance abuse and sexual conduct. The court denied the motion, stating that the information was "immaterial and irrelevant to the issues at bar."

{¶ 112} During L.M.'s cross-examination, L.M. testified that she had spoken about

the sexual abuse with her counselor.   Jury Tr. at 364.   In a sidebar discussion, defense counsel renewed his request to ask L.M. about some of the things she had mentioned to her counselor.   The prosecutor objected, arguing that it was irrelevant and that anything related to other sexual activity would be barred by the rape shield law.   Defense counsel clarified that the motion in limine referred to L.M.'s father's masturbating in front of her, her parents' substance abuse, and their swapping of partners.   After asking when the counseling occurred (2013), the trial court sustained its prior ruling.

{¶ 113} In general, the admission or exclusion of relevant evidence is within the sound discretion of the trial court.   *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39.   While cross-examination is permitted on all relevant matters and on matters affecting credibility, Evid.R. 611(B), the trial court "has discretion to limit the scope of cross-examination taking into account the particular facts of a case."   *State v. Kearns*, 2016-Ohio-5941, 71 N.E.3d 681, ¶ 13 (10th Dist.); Evid.R. 611(A).   The term "abuse of discretion" indicates an attitude that is arbitrary, unconscionable, or unreasonable.   *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 114} We find no abuse of discretion in the trial court's exclusion of questions about L.M.'s statements during counseling.   There is no suggestion that L.M.'s mental health history or her parents' behavior affected L.M.'s understanding or memory of what occurred with Kelly, or that those circumstances were relevant to L.M.'s credibility.   Based on the information before it, the trial court reasonably concluded that the information from the counseling would be irrelevant.   Defense counsel did not renew its motion in limine during A.M.'s testimony, and any issue regarding the use of her medical

records for cross-examination is both waived and moot.

{¶ 115} Kelly's sixth assignment of error is overruled.

## IX. Conclusion

{¶ 116} The trial court's judgment will be affirmed as to Counts 5-10 (L.M.) and Counts 14 and 16 (M.D.) and vacated as to Counts 1-4 (A.M.).

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.